CENTRAL TRUST Co. and another *v.* WABASH, ST. L. & P. RY. Co. and others. (*In re* BONNER and others, Petitioners.)[1]

(*Circuit Court, E. D. Missouri*  March 22, 1887.)

1. RAILROAD COMPANIES—RECEIVERSHIP—LABOR AND MATERIAL LIENS—MORTGAGE.
    Preferred debts for work done and materials furnished, incurred in the operation of a division of a system of railroads owned and operated by a single corporation, are a lien upon all the lines of the system, prior in right to both local and general mortgages

2. SAME—NON-PAYING LINES.
    The mere fact that some of the lines of such a system have been paying and others not does not justify a casting of the entire burden of the preferred debt upon the latter.

3. SAME—APPORTIONMENT OF EARNINGS.
    Where such a system of roads is covered by general mortgages, and some of its branches by local underlying mortgages, and the entire system is placed in the hands of receivers in proceedings to foreclose the general mortgages, the earnings of the system should, as a rule, be apportioned among the different divisions for payment of taxes and interest on underlying mortgages upon a mileage basis.

4. SAME.
    The ordinary rules of business should be observed, however, and a larger proportion of the earnings may properly be expended upon one division than upon others, in case it is necessary to the prosperity of the system as a whole.

[1] See 29 Fed. Rep. 161, 618.

5. MORTGAGE—RIGHTS OF MORTGAGOR BEFORE FORECLOSURE—INCOME.

A mortgagor has a right to the absolute control of the income of his property prior to the institution of proceedings to foreclose.

6. JUDICIAL SALES—PURCHASER'S RIGHTS—DECREE.

A purchaser at a judicial sale is entitled to look to the judgment or decree for the measure of his rights, and need look no further. It is his contract with the court, and should not be changed.

7. SAME—THE WABASH SALE.

The decree under which the property of the Wabash, St. Louis & Pacific Railway Company was sold did not bind the purchasers to pay the underlying mortgage debts before receiving possession, nor did the court reserve power to compel payment of such debts.

8. SAME—RIGHTS AFFECTED PRIOR TO DECREE—ESTOPPEL.

A system of railroads, covered by general mortgages as well as local underlying mortgages, was placed in the hands of receivers by the mortgagor. Subsequently proceedings were instituted to foreclose the general mortgages, and the foreclosure suits and the original suits were consolidated, and the receivers were continued in possession, and administered the whole system for the benefit of all parties in interest. The holders of bonds secured by underlying mortgages were represented by their trustees, and a decree foreclosing the general mortgages, and ordering a sale, was entered without objection. The entire property was sold pursuant to the decree, and the purchasers agreed to pay all preferred debts before receiving possession, and the contract of sale was partially executed. *Held*, that it was too late, after such decree and sale, for holders of underlying mortgage bonds to object to the manner in which the earnings of the system had been applied prior to the decree, and to proceedings to foreclose their mortgages, and too late for the court to so alter the decree as to change the rights of the purchasers.

In Equity.

*Henry Crawford* and *Robert T. Lincoln*, for petitioners.

*Thomas H. Hubbard*, *Wager Swayne*, and *Wells H. Blodgett*, for respondents.

BREWER, C. J.  There was argued before us, two weeks ago, a petition on behalf of certain bondholders, holding bonds secured by underlying mortgages on lines east of the river, setting forth substantially that, in the operation of the Wabash road, those lines had earned above the operating expenses a large surplus,—some million and a half dollars; that the receivers had not paid the taxes for 1886 on those lines; that they had paid no interest on those bonds for the last two years; and asking that the court order the receivers to pay those taxes, and appropriate those surplus earnings, alleged to have been diverted to the payment of preferential debts and operating expenses of non-paying branches, to the payment of the interest on these underlying mortgages, and that, if they have no money in their possession, that then the court order receivers' certificates to be issued, to be a first lien upon the property in their possession, and especially upon certain lines of road covered by no underlying mortgages; or that, in lieu thereof, the court direct the purchasing committee to pay such amount so alleged to be diverted, and make such payment a condition of their obtaining possession.  The arguments in support of and against this petition were protracted through two days, and quite a number of matters were discussed.  We have taken time to consider the various questions, and to review the report of the receivers which was presented, and made the basis of those arguments.

For a clear understanding of these questions, it will be necessary to go back to the inception of this receivership. At that time there was a single corporation,—the Wabash, St. Louis & Pacific. It was a corporation made up by the consolidation, in 1879, of various minor corporations. After the consolidation by which the Wabash, St. Louis & Pacific was brought into being, it absorbed still other roads by consolidation, and took possession of others by lease. It was an insolvent corporation, and it came into court pleading its insolvency, and asking the court to take possession of its entire property, and administer it for the benefit of all concerned. There was then but a single corporation, owning many pieces of property, having possession of others by lease, which separate pieces of property were, many of them, covered by underlying mortgages. As a single corporation, it was also in debt to an amount exceeding $3,000,000 of floating indebtedness, and yet of that character of indebtedness which, by the decision of the supreme court, was preferred to all mortgages. Thus the preferential debts of three millions and over were a prior lien upon all the roads belonging to the Wabash; not a lien upon one division, and no lien upon another, but a lien upon each and all of them, prior in right to every mortgage, general or local, junior or senior. It made no difference where those obligations were incurred, —whether in the operation of one line or another; they were obligations of the single debtor, and enforceable in law against every part of its property. In a case of a complicated railroad system like this Wabash, not only were they at law the obligations of one debtor enforceable against all its property, but in equity also they were chargeable upon all of its property.

Much was said in the argument about the main lines paying, and branches not paying, and somehow the idea seemed to be that by reason of this fact the paying lines were under no obligation to pay these preferential debts, and that in equity, if not at law, the court should saddle the burden of them all upon the non-paying lines. In apportioning the earnings of this single corporation among these various divisions, the general rule is to apportion them upon a mileage basis. The freight which passes over a branch may pass on that branch but a short distance, and then, perhaps, a long distance over the main line. All that is credited to the branch is the mileage proportion of the freight charges, and yet the business which those branches have thus poured into the main line may well be the very business which has made those main lines paying lines. It may not be possible accurately to determine the amount of such business. I see tables have been prepared indicating that several million dollars of business has passed over those branches onto the main lines, and which but for those branches might never have touched the main lines. In that aspect they are operated for the benefit of the entire property. As my Brother THAYER well stated in our consultation, to treat those non-paying branches as useless incumbrances, which should be cut off, would be like damming up the little branches of the Mississippi, because they are not navigable as the mighty river into which they pour. It is the combination of their smaller currents which makes

the mighty volume of the Mississippi, and renders it navigable; and so it was the combination largely of the little currents of business which flowed from those branches in upon the main lines which made them paying lines, and no man with the figures before him can now say how much of the business of the main lines is and was due to the fact that these branches were kept in operation.   So that, both in law and in equity, the obligations of this single consolidated corporation were enforceable against each and every part of its properties; that is, certainly upon each and every part of the properties owned by it.   There may be some difference as to the leased lines, and some other questions may arise there. I do not mean to affirm that these preferential debts ought to be distributed among the different lines upon a mere mileage basis, or that there would be no equities to be considered in apportioning their burden.   All I mean to say is that the mere fact that some lines were paying, and others not, would not justify a casting of their entire burden upon the latter.

That was the situation when the receivers took possession.   There was a consolidated property, covered by a general junior mortgage, whose various divisions were, many of them, covered by separate senior and underlying mortgages, and all burdened with this $3,000,000 and over of preferential debts.

On the thirty-first day of December last, the time to which this report of the receivers is brought, the amount of the ascertained unpaid preferential debts was $2,425,000.   All this, by the terms of the decree, the purchasing committee must pay before they get undisturbed possession of the property bought.   Now, the aggregate surplus of all the lines,—and by the surplus I mean, if I may so speak, the undistributed surplus that was not used for the payment of interest, that which is given as surplus in this report,—the aggregate of the surplus of all the lines east and west of the river is only $2,566,000, leaving the fractions off; only $141,000 more than the ascertained unpaid preferential debts.   To these unpaid ascertained preferential debts must be added the costs of the foreclosure proceedings, and the unascertained preferential debts,— two items which will unquestionably amount to at least two or three hundred thousand dollars.   Hence when the purchasing committee pay off this indebtedness, as they must before they get possession, they pay an amount in excess of all the existing surplus.   As between, therefore, the consolidated corporation as a single debtor and the purchasing committee, there would not be the slightest equity in casting a single dollar's more burden upon them.

But suppose there were some equities as between different lines, some equities never known until this report of the receivers was presented, and to which, therefore, the attention of the court was never before drawn, would the court now have the power to do anything of the kind asked for?   Suppose, further, that the court, during its administration, has made countless blunders,—errors of fact and errors of law,—would the court to-day, in the face of the decree that was signed and entered, all parties in interest present and none objecting,—would it, in the face

of that decree, have the power to grant the relief sought? It is as old as judicial sales, iterated and reiterated with unvarying and emphatic voice, that a purchaser at a judicial sale looks to the judgment or decree for the measure of his rights. He does not look back of the decree to questions which might have been presented, or might have been differently determined between the litigating parties; he looks to the decree, and upon that alone he rests. That measures his rights. It is his muniment of title, and, when he purchases and pays, he has a right to say that that is his contract with the court, and no court ever did, and no court ever ought to, change the contract which it has made, when by its decree solemnly entered it invites persons to buy, and upon the faith of that invitation persons do buy and pay.

This purchasing committee is a purchaser. It is true, they represent the old corporation, its various stockholders, common and preferred, and the general mortgage bondholders, but, over and beyond that, they are called upon and do pay for this property from two to three million dollars in cash. As such they are cash purchasers, and entitled to all the rights and the protection of cash purchasers.

Now, let us look at that decree. Somehow or other there seems to have been insinuated or suggested the idea that under this decree the purchasers did not merely purchase the property subject to prior mortgages, but that they bound themselves to pay such prior mortgages; or, perhaps, more correctly, that the court reserved therein the power to compel them to pay any, and, if any, then all, such prior mortgages, principal and interests, before it surrendered to them any part of the purchased property. Well, I had something to do with that decree, and never, until months after, did it enter into my mind that there was any attempt to charge upon the purchasers the burden of prior mortgages, or that this decree contemplated anything other than the foreclosure of the general junior mortgages, and the sale of the property subject to those prior mortgages. And now, after all that I have heard, and after all the care that I have taken or can take in studying this decree, I cannot see that which furnishes any reasonable excuse for saying that the court contemplated by this decree to charge upon this purchasing committee, or reserve the right to charge upon this purchasing committee, as a condition of obtaining possession of this property, the payment of either principal or interest of any prior mortgage. And yet that is practically what the petition aims to obtain.

In the first place the decree forecloses the Central Trust Company's mortgage, and the collateral trust mortgage; finds the amount due thereon, the failure to pay, and orders a sale therefor. It is thus, in terms, a foreclosure of these two mortgages. It then goes on to say, as would be proper in an ordinary foreclosure of a junior mortgage, and a sale subject to prior liens, that "this decree, or any sale made thereunder, shall not in any way prejudice or affect the rights of parties to or persons interested in certain mortgages and deeds of trust which are thereafter specified; but all the rights of such persons and parties are hereby reserved." It enumerates those various mortgages and deeds of trust, ·

states especially the amounts due under them, and closes by saying that the "statements in this decree of the amount of bonds outstanding, or of interest or rental paid or unpaid on any of the mortgages, deeds of trust, leases, or contracts, etc., shall not be taken as adjudicating or determining the matters so stated. Such amounts are so stated in this decree only for the purpose of enabling the parties who may desire to purchase said property to determine approximately the amount of prior liens or other charges upon said property, and each part thereof."

Could such language as that be used if it was in the contemplation of the court that these prior liens were being foreclosed, or that the court reserved the power to compel the payment of them as a condition of obtaining possession under the sale? Then, further, the part of the decree which was specially referred to, after ordering that a conveyance should be made, goes on to state:

"Such conveyance or assignment shall not have the effect of discharging any part of said property from the payment, or contribution to the payment, of claims or demands chargeable against the same, whether for costs and expenses, the expenses of the receivership of said property, and the full payment of all the debts and liabilities of said receivers, or upon intervening claims allowed or to be allowed, or upon any other claims or allowances that have been or may be charged against said property, or any part thereof, or said receivers."

It is true that the word "claims" is a broad word, but, used in the connection in which it is found, it is obvious to what reference is made. Besides, the clause simply affirms that the conveyance was not to have the effect of discharging any of the property from the payment of those claims. Of course it did not. Nobody has ever thought of releasing any part of this road from the burden of any prior claim, mortgage or not mortgage, which rested upon it. That same language appears where the court directs the distribution of the proceeds of sale—*First*, to the payment of costs and so forth; *second*, to the payment of the indebtedness of the receivers, and all other claims which said courts, or some of them, may adjudge to be superior to said bonds." What bonds? Why, all the bonds referred to in the decree. The language, of course, refers to those things which come in in the process of administration, and not to the underlying mortgages, none of which were being foreclosed. Furthermore, it should be noticed in passing that in one of the circuits in which ancillary administration was had the trustees in all the underlying mortgages were dismissed from the suit.

There can be no shadow of a doubt but that the decree contemplated (and the purchasers had a right to rely upon that fact) only a foreclosure of the junior mortgages, the general mortgages, and that the purchasers bought the property subject to the existing unforeclosed prior mortgages. That being the case, the court has no moral right, if it had the legal power, to saddle another dollar of burden upon the purchasing committee. I might leave the case right here, but so much was said in the course of the argument in reference to the administration that I am not content to stop. Our attention was called to the fact that interest on the underlying

mortgages on the main lines west of the river was paid for 1885 and 1886, while interest on those on the main line east was paid only for 1884; and the implication was of partiality in the administration,—of a diversion of the earnings of the lines east to the payment of interest on the lines west, which equitably should be adjusted. Now, if there has been partiality in the administration of this property by this court or these receivers, by which one part of the Wabash road has been sought to be benefited and another part injured, it ought to be known, and, if known, to be condemned.

It is a fact that the interest on the main lines east was paid for the year 1884, and then interest payment stopped. It is a fact that the interest on the main lines west was paid for the years 1885 and 1886. It is a fact that the total amount of interest paid on those lines west is $1,849,-000; on the main lines east, $780,000,—an excess of interest paid on the lines west of $1,068,000. It is a fact that the present surplus of the main lines east is $1,578,000; that of the main lines west is $766,000; leaving an excess of surplus credited to the main lines east of $812,000, which apparently is an excess of contribution to the payment of these preferred debts, or the operating expenses of the non-paying branches.

Now, these three things stand out in bold relief, shown by the reports of the receivers presented for examination; but it is also true, as I stated some time ago, that the rule for measuring the earnings of these different lines was on the mileage basis; that when freight was carried 10 miles on the main line east, and 100 miles on the main line west, the freight charges were apportioned according to the mileage. That is the general rule. And the fact is that the main lines west have been earning largely more than the main lines east. Taking the earnings during the entire receivership, and the net earnings of the lines west exceed those of the lines east $2,448 per mile, which, multiplied by the mileage of the west lines, 427.5, makes $1,046,000, the extra surplus earnings of the west line; an amount exceeding by $234,000 the apparent excess of contribution which the east lines have made to the payment of preferential debts, and which comes within $22,000 of being equal to the total excess of interest paid on the west lines. So that, in paying up to the present time the interest on the west lines, and in stopping the payment of interest on the east lines in 1885, the receivers have simply respected the equities which arose from the superior mileage earnings of the west side, and that is all.

The apparent discrimination and partiality, when you find the extra mileage earnings of the west side exceed those of the east lines by substantially the amount of extra interest paid, disappear, and it is evident that there has been no partiality. So that, if there was any right under the decree to make an adjustment between the east and west lines, all the equities of their earnings are against any change. I do not mean to say that in the administration of this vast property, with all the interests which were collected in it, the receivers were bound to ignore the ordinary laws of business. On the contrary, it was their duty, as far as possible, to keep the system together. They had to respect the obliga-

tions of business paying in one direction, perhaps, more than in another, for the purpose, as far as they could, of preserving the integrity of the system. Take a single instance. Here is the St. Charles bridge. The interest which they have paid on these bridge bonds is $140,000. It would have been culpable negligence on their part, if they had the money, not to pay that interest, and thereby let the bridge be swept out of the system, and the connection of the Kansas City line broken up. All I mean to say is that, having regard to business necessities such as these, the figures which the receivers return show that they have treated every part of this system, east and west, fairly and impartially.

But it is further urged by counsel for these petitioners that if there be a surplus on the main lines west, and therefore no right to charge the surplus of the main lines east upon them, there are 485 miles of road burdened by no prior mortgages, which the purchasing committee take free from any lien, and the court should therefore tax upon those lines by receivers' certificates, or in some other way, the burden of this surplus belonging to the main lines east which has been used for the preferential debts. There are several reasons why this ought not to be done. The *first* one, that I have considered already, is that it is not authorized by the decree. *Second.* It is as yet unknown whether the east lines will not, on foreclosure, produce both principal and interest of their underlying mortgages. These petitioners have no title to the *corpus* of the property. They stand simply as lienors upon a particular division or divisions, holding underlying and senior mortgages; and if, upon the foreclosure of those mortgages,—a foreclosure which they have already caused to be instituted,—those lines pay them their principal and interest, it is no concern of theirs what becomes of the west line, or any other property. *Third.* It would not be right, because the mortgagor has by the settled law of this country absolute control of the income of his property prior to the legal proceedings instituted by the mortgagee. It is true that this receivership was instituted by the mortgagor; that the receivers were appointed to manage this property for the benefit of all concerned; and it may be true, as counsel for petitioners say, that they had a right to rely upon that, and were not bound to come in and make personal application for the appropriation of such income. Concede all that, but it is true that they were represented in court by their trustees. They were here when the decree was signed. If they did not formally consent, there was certainly no objection from one of them. At the time the decree was signed the court-room was full of counsel representing the various interests in this Wabash matter, and it was publicly announced that all parties consented. Again, the relief prayed for is not warranted by any orders made pending during this administration.

And here I wish to refer to some things that have taken place during this administration. At an early day the court directed that separate accounts be kept of the earnings and expenses of the different lines, and said that the time might come when there would have to be an adjustment of the equities between these different roads. What was to be adjusted? What was the thing which runs through all these orders and

opinions? We had taken possession, and found a burden of three or four millions of floating indebtedness,—preferential debts. No man could then foresee whether by sale or by the earnings of the road, or otherwise, that amount of preferential indebtedness would be paid, and some distribution might have to be made of this burden. We took every precaution that we thought of at the time to have the accounts kept with such fullness and detail that, when the time came to the closing up of this administration, any party could find on the books of the receivers all the evidence of his exact rights and equities, and could say: "There are the figures which lay the foundation of my claim." You, gentlemen, are here to-day resting upon a report based upon a system of accounts which the court ordered to be kept, so that at any time any equities existing in favor of anybody might be considered and determined. Happily, by the sale which has been effected, this burden of preferential indebtedness is taken off from this property, and taken off from all of it. There is not a line or division east or west which will not be, when the final payment is made, free from every dollar of preferential debt, every dollar of court indebtedness, every dollar of anything except the prior mortgage indebtedness.

At another time we ordered payment of rent out of the earnings of a leased line, and, in the course of an opinion which I then delivered, I said that those surplus earnings belonged to those different lines, and they should be used in payment of their obligations. But, if you will read the orders of the court that were entered, and the opinions that were announced, you will find no attempt to set aside the orders made by the court, at the inception of the receivership, that the preferential debts should be first paid. Those orders stood like warrants drawn upon a treasurer to be paid out of funds not hereinbefore appropriated.

Finally, the petition ought not to be granted by reason of the action of these petitioners. When this decree was entered, the sale made and confirmed, and the money paid, there was a single administration covering the entire property. Relying upon the uniform course of procedure in all the federal courts of this country, the purchasers had a just right to expect that, when they complied with the terms of the sale, they would receive possession of the entire property. Through the action instituted by these petitioners, that expectation no longer exists. There has been a disruption of this receivership at their instance, and it leaves an uncertainty about the future which forbids any present adjustment. The purchasing committee have bought this entire property east and west, and, according to the decisions of the supreme court, they now have the legal title to it. Who can say that that new administration which has been undertaken across the river will work out a surplus or leave a deficit? What equity would there be in turning over a million and odd dollars to the payment of claims upon property which the purchasing committee cannot to-day get possession of, and which, when they do get possession of, may be found burdened with a million dollars or more of expenses incurred under the new management? for it must be remembered that this court can give them possession of only a part

of the property which they bought, and, before it finally surrenders the possession and control of that, it is exacting from them the full payment of all the receivers' debts, and of all preferential debts of the entire Wabash road.

My judgment is that the petition of the petitioners must be denied. In all this discussion I have assumed, as was done in the argument, that the figures and accounts given in this report of the receivers are correct. Of course, any party has a right to challenge the correctness of that report; and while this petition will be denied, it will be denied without prejudice to the rights of these petitioners, or other parties, to come into court at any time, and challenge the correctness of this or any report of the receivers.

In reference to the further disposition of this property. On the thirty-first of December the court ordered the purchasing committee to pay $1,000,000 in cash or receivers' certificates into the registry of this court, and give a bond in the penal sum of $1,000,000, conditioned for the payment of such further sums as should be ordered paid, and to take possession of the property. They have complied with the order so far as to pay the million dollars into the registry of this court. They desire to take possession of the property, and suggest to the court that the court take, in lieu of this bond of a million dollars with personal security, the bond of the new corporation which has been organized, and to which the property has been transferred, with certain conditions. It appears there is outstanding to-day $459,000 receivers' certificates, $254,000, more than half, of which will be due at the close of this month, the balance maturing through the coming year. There is probably half a million more of indebtedness outside of that. In the decree, and in the orders of confirmation, and subsequent orders running along this line, it has been expressly stated that any delivery or possession would be subject to the right of the court to retake the *corpus* of the property upon a non-compliance with any of its orders in respect to the payment of claims. Of course, the property thus retaken and subject to resale is ample security for the amount of unpaid claims, and yet it is fair to the holders of the underlying mortgages on the west side of the river that they should not be exposed to the risk of having their property retaken and resold.

Inasmuch as the court, by virtue of the proceedings across the river, is not now able to give possession of the entire property, Brother TREAT and I last December, and my Brother THAYER and I now think, that a personal bond of $1,000,000 or its equivalent should be required. The objection which was made to the giving of a bond was this: that persons did not like to go on an obligation of that kind, and pledge their personal credit in something which would run on indefinitely. But the court did not contemplate such a bond. All that it contemplated was a bond for the payment of the first million dollars that should be ordered. This bond may recite on its face that every payment made in compliance with the order of the court is to be credited upon and operate as a reduction of liability *pro tanto* thereon; so there will be no con-

tinuing and indefinite liability thereon. It was stated to the court that the purchasing committee had money in bank, and hence the receivers' certificates which are due this month should be paid, and then the bond need be only $750,000.

There is an additional matter in regard to the surrender of possession. There will pass into the hands of the purchasing committee, not merely this real estate and tangible property in our grasp, but a large amount of convertible assets, personal property, stock, bonds, etc., which are in the Mercantile Trust Company's possession. They will get possession of these, and may do what they please with them; so that, in view of this fact, as well as the others named, we have concluded to order that they pay the receivers' certificates due this month, and then give bond in the sum of $750,000, conditioned as above stated. The purchasing committee, or the new corporation to whom the property is turned over, will be required to designate some counsel here upon whom notice of any matter can be served. At the end of every 90 days they will be required to pay the various amounts which shall have been allowed during the interval, as well as receivers' certificates maturing therein, and at such time they will be credited on the bond in just the amount they so pay. Further, we shall want them to take possession at the close of this month.

THAYER, J. Concurring fully in what has been said by the circuit judge, I shall add but one or two suggestions. An insuperable objection to granting the prayer of the petitioners, in my judgment, lies in the fact that such action would materially modify the terms of the decree under which the purchasing committee have bought, and, in effect, compel the committee to take the property on different terms than were proposed at the time of the sale, and this after the contract of sale has been partially executed. There are no reservations in the decree, when fairly construed with reference to the *main purpose had in view* by the court when the decree was entered, to protect the obligations assumed by the receivers, or created by them in the course of their management, which are broad enough to authorize us at this time to issue receivers' certificates for surplus earnings of the main line east, and compel the purchasing committee to pay the same, or give bond for their payment, or take the property purchased subject to such new obligations. This feature of the case has already been sufficiently alluded to, however. I merely emphasize the point that we have no legal right at this time, the decree having been settled after mature deliberation, and with full opportunity to all parties to be heard, to modify its provisions, or take any action that would in effect change the terms of the sale.

But, taking a different view of the matter,—looking at the case purely from an equitable stand-point, and as if we were free to act in this matter,—I cannot see that any inequitable result is liable to follow from refusing the prayer of the petitioners. If the outcome of these complicated foreclosure proceedings could have been foreseen,—if it had been possible, from the outset, to withhold all interest payments on underlying mortgages without causing the total disruption and wreck of the

whole system,—perhaps the fairest course to have pursued would have been to limit the disbursements by the receivers to current operating expenses, and to the indebtedness for past operating expenses existing when the receivers took charge, which was clearly a first lien and charge on all the property of the consolidated company, treating it as a unit. I say, *perhaps* that would have been the wiser course, because no one can say with certainty what the result might have been on the interests of all concerned, whether for the better or the worse.

Suppose, however, that such course had been pursued. Availing myself of the report which has been used on both sides by counsel pending this argument, which I suppose is substantially correct, it appears that the net earnings of the lines east and west, exclusively of interest disbursements, have been, in round numbers, in the neighborhood of $3,850,000; that the total of preferred claims (deducting available assets outstanding when the receivers took charge) were in the neighborhood of $3,047,000,—showing that, if no interest charges on underlying mortgages had been paid, the sum of about $800,000 would now be available to be distributed, on some equitable basis, in interest payments on bonds upon the lines east and west.

Now, the report shows that there has been paid out for interest on lines *east* the sum of about $700,000. It is fair to assert that on no basis of distribution would the lines east be entitled to $700,000 for interest, if the surplus of $800,000 applicable to that purpose was now on hand for distribution, and if no interest disbursements whatever had thus far been made. If out of the gross earnings of the property in the receivers' hands money has in fact been taken to pay interest on underlying mortgages which might more properly have been applied to that class of claims, aggregating over $3,000,000, as before stated, that were a prior lien on all the property of the consolidated company, the result has simply been that such prior lien claims are now outstanding and unpaid to the amount of about $2,200,000; and it is this outstanding claim that the purchasing committee are required, under the decree, to liquidate or secure, as a condition of being let into possession of the property purchased. And I may further add that under the decree the court holds the lines west, being the only ones now within its *actual* custody, as security for such payment. The fact is obvious, however, that the lines east (now out of the court's actual custody) have had more than their share of the total surplus earnings that would have been applicable to interest if the total net earnings of the consolidated company had been applied, as they might legally and equitably, and, as I think, they might more properly, have been applied, solely to the payment of what was confessedly a preferred charge against its entire property, superior to the petitioners' incumbrance.

In view of the consideration last mentioned, that the lines east have received more than their ratable proportion of the net surplus applicable to interest charges, if interest on all the lines had heretofore been withheld, and in view of the fact that we have no assurance that the property of the lines east is not amply sufficient to pay petitioners' bonds and

accrued interest in full, and in view of the fact that the trustees in the mortgages represented by petitioners have been parties to this suit, and have hitherto taken no exceptions to the application of surplus earnings as heretofore made by the receivers, I am clearly of the opinion that it would be the duty of the court to deny the prayer of the petitioners, even if we felt it to be fairly within our power under the decree to grant the same.

I accordingly concur in the order dismissing the petition.