ILLINOIS TRUST & SAVINGS BANK v. OTTUMWA ELECTRIC RY.
(DOUD, Intervener).

(Circuit Court, S. D. Iowa. September 8, 1898.)

No. 203.

1. CORPORATIONS—STREET RAILROADS—FORECLOSURE OF MORTGAGE—PREFERENTIAL CLAIMS.
   One furnishing money to an electric street-railroad company to pay maturing interest on its bonds is not entitled to its repayment as a preferential claim as against the mortgage, though the amount was a part of an advance originally made for the purpose of making necessary additions to the company's plant, to be repaid from current earnings, and was diverted to the payment of interest for convenience, to enable the company to meet the interest promptly, and under an express agreement with the company that the current earnings which would otherwise be used in paying the interest should be devoted to the completion of the improvements, which was done, and that such earnings should afterwards be used to repay the advance.
2. SAME—ELECTRIC LIGHT COMPANIES.
   The doctrine of preferential claims is applicable to electric lighting companies, having a municipal franchise, with the right to use the streets, and being engaged in furnishing public lighting to the city as well as supplying private consumers.
3. SAME—STREET RAILROADS—ADDITION TO PLANT.
   An advance made to an electric railway company, which was also engaged in furnishing electric lights, to build a power house to supply additional power, which was necessary to keep the company a going concern and to enable it to carry out a profitable contract to supply lights to the city, as well as to the inhabitants, for which it had a franchise that would otherwise be forfeited, constitutes a preferential claim as against the mortgagees of the company, where the advance was made on an express agreement that it was to be repaid from the current net earnings, and the amount expended was not greater than general business prudence might properly have regarded as necessary.
4. SAME—ADVANCES BY STOCKHOLDER.
   The fact that one advancing money to a street-railroad company for necessary improvements is a stockholder or bondholder does not affect his right to a preferential lien as against a mortgagee, where he acted in good faith.
5. SAME—APPLICATION OF PARTIAL PAYMENTS.
   Where one who had made advances to a street-railroad company, a part of which was entitled to allowance as a preferential claim on a subsequent foreclosure and a part was not, received partial payments thereon, which neither he nor the company applied to any particular part of the debt, such payments will, at the instance of the mortgagee, be applied to the preferential claim.

Upon Exceptions to Report of Master as to Intervening Petition of Levi P. Doud.

McNett & Tisdale, for intervener.

E. E. McElroy, for defendant Ottumwa Electric Ry. and for plaintiff trustee.

WOOLSON, District Judge.    Upon April 14, 1896, on application of complainant above named, who was the trustee in the trust deed given by defendant (the Ottumwa Electric Railway) which is sought to be foreclosed herein, a receiver was by this court appointed for the

said defendant railway. Levi P. Doud, by leave of court, having filed his petition of intervention, the same, with all the issues relating thereto, was referred, on the merits, to standing master, William C. Howell. The report of the master has been filed, finding that intervener, Doud, is entitled to judgment against the defendant railway for $11,000, with interest, etc., but finding against the claim of said intervener for a preferential claim, over the trust deed in suit, for any portion of his claim. The present hearing is upon exceptions filed by intervener, Doud, to the master's report.

To most of the general findings of fact as reported by the master no exceptions are taken. The defendant railway was engaged in a threefold enterprise: (1) Operating an electric railway system; (2) operating an electric lighting plant, supplying the public (city of Ottumwa), and also private consumers; and (3) operating a steam-heating plant. These different ramifications of defendant's enterprise used, wherever practicable, the same machinery, employés, etc. So that while, in one sense, these several matters were separate, yet they grew on one stalk, and were closely united and related in their entire existence.

In June, 1894, said defendant railway had outstanding, of the bonds secured by the trust deed foreclosed in the main action herein, about $200,000. The railway was unable to pay the semiannual interest thereon due that month, whereupon intervener, Doud, and others, loaned the railway the amount required for such payment, on the agreement that such loan should be repaid to them out of current earnings, and same has been so repaid. At said date, June, 1894, the railway was furnishing the public lighting for the city of Ottumwa, under a contract which by its terms expired in March, 1895. The railway electrical plant was using power furnished by the Iowa Water Company, of said city of Ottumwa, under a contract which by its terms expired the latter part of the year 1894. This latter was, to the railway, a burdensome contract, for whose fulfillment the railway was compelled to pay to the water company annually $6,000. The water company had become insolvent, had passed into the hands of a receiver, and, through causes not here necessary to state, was not able reliably and satisfactorily to furnish the power required by the railway in the operation of its plant and enterprises. A temporary arrangement was, however, made by the railway by which the water company was to continue furnishing power until March, 1895; that being the period when the city lighting contract, held by the railway, would expire. Intervener, Doud, was during this period a director in said railway, and its largest stockholder. The evidence discloses the earnest efforts attempted for providing ways and means to enable the railway to continue its electrical enterprises, and including its electric lighting branch, which the evidence shows, and the master reports, was the most profitable of its different enterprises. Because of the distance—about a half mile—between the water company's plant and that of the railway, the furnishing of power under the water company's contract was recognized by all concerned as being in many respects more expensive than would be the furnishing of such power at the railway plant. There appears no difference of opinion

as to the desirability of so arranging the railway plant that it should be able to and would furnish its own power.   But the current earnings were insufficient to meet current expenses, provide the means for thus arranging the plant, and paying the semiannual installment of interest falling due in December, 1894.   An attempt was made to secure a temporary loan at the Ottumwa banks for payment of this interest.   But the attempt was unsuccessful.   Meanwhile the railway had entered upon making such changes in its plant, and so adding thereto, as might be necessary to arrange for the supplying, by and at the railway plant, of the electrical and other power needed in its business.   This required, as it was determined by the railway, the building of a one-story building, obtaining larger engine force and greater boiler power.   The evidence justifies the conclusion that intervener, Doud, at the request of defendant railway, agreed to furnish funds to be used in this rearrangement of the plant.   When it was ascertained that the railway was not able itself to pay, and had failed to borrow the funds to pay, the December, 1894, semiannual interest, intervener, Doud, was induced by the railway to permit the diversion of $6,000 of the funds he had furnished, so that, instead of applying same to payment of expenses of the rearrangement of the plant, that sum should be paid out to discharge this December semiannual interest.   But the master correctly finds from the evidence that Doud thus consented only on the express agreement that the current earnings should be applied to reimburse him, after they had been applied to and had discharged the rearrangement expenses. We are justified in declaring that this contract was made largely because of the fact that the interest payment must be made at once and in one sum, while the rearrangement expenses could be paid from time to time, as current earnings permitted; and that the further idea was advanced that it made no difference to Mr. Doud whether this $6,000 of his funds was paid on rearrangement expenses (and afterwards this was repaid to him from current earnings) while current earnings paid the interest installment, or that his said funds discharged the interest installment (and afterwards this was repaid to him from current earnings) and current earnings met the rearrangement expenses as they were incurred.   No doubt one element in determining the matter was the recognized fact that the latter method was more easily pursued under the existing facts.   Six thousand dollars of Doud's funds were thus used to discharge the December, 1894, installment of interest on bonds herein, under the express contract with the railway as to his being repaid out of current earnings.   The master reports the rearrangement of the railway plant as completed, at a cost of about $19,000.   Intervener, Doud, furnished, besides said $6,000, an aggregate of $7,500, which went into this rearrangement of plant.   He has been paid $2,500 by the railway, so that the $13,-500 has been reduced to $11,000, which, with interest, the master finds due to Doud from the railway.

First, as to said $6,000 used to pay the December, 1894, semiannual installment of interest on bonds under trust deed foreclosed herein: Upon this branch of this intervention, the report of the master, and the reasoning which brings him to a decision against the preferential

claim prayed, is, to my mind, persuasive. This sum was not used by the railway for the purpose of keeping it as a going concern. The argument, while forcibly presented by counsel, that Doud's consent to the diversion of this sum from the rearrangement expenses to payment of interest permitted current earnings—which otherwise would have been expended in paying this interest—to be applied on rearrangement expenses, is not sufficient to justify the preferential claim made. The payment of this interest did not make or keep the railway a "going concern." True, it did possibly prevent a foreclosure of the trust deed, which otherwise might have occurred because of default in payment of that interest installment. But such foreclosure would doubtless then, as it has now, been attended with orders providing for operation of the railway enterprises meanwhile. Nor is the mere fact sufficient that there was an express contract that the payment should be reimbursed out of current earnings. While it is true that the courts lay great stress on such a contract where the matter sought to be established as a preferential claim bears a close relation to the necessities of the situation and the requirements essential to the continued existence and operation of the mortgagor, I know of no case, and no argument occurs to me, which justifies giving to such a contract this preferential character, where that for which the payment was expended is not closely and essentially connected with or essential to the operations of the company as a "going concern." Upon this point the exceptions to the master's report must be overruled.

Second, as to the amounts furnished by intervener, Doud, and used in paying for material, labor, etc., used in providing the railway with power, etc., facilities: The evidence presented by intervener, Doud, of the indebtedness to him of the railway, is contained in the notes of the railway held by him. That he furnished the money evidenced by these notes is conceded. That all except $6,000 of such money was expended in building the new power house, and providing additional engine, boiler, etc., facilities, is also uncontradicted. The master's report adopts the decision which this court has heretofore made herein that an electric street railway is of such a quasi public character as that the doctrine of preferential claims may apply if otherwise authorized. This point was expressly decided herein, after full argument had thereon. It is therefore the law of the case for the present hearing. I have no doubt that the same rule may be held to apply to electric lighting companies having, as had defendant, a municipal franchise, with right to use therefor the streets, etc., of the city, and being engaged in furnishing public lighting to the city as well as supplying light for private consumers. Reyburn v. Light Co., 29 Fed. 563.

I have carefully read the report of the master on this branch of this intervention. His view of the case is ably elaborated and forcibly presented. With the general legal propositions deduced by him my views are in substantial accord. In their application to the facts in this case I am compelled to differ with his conclusion. My time is too heavily pressed with official duties to permit the extended consideration I would prefer to give, and which is perhaps due to the

excellent report of the master, on the points wherein my judgment differs.   I may but summarize my conclusions:

(1) The evidence convinces me that the erection of a power house— that is, the enlargement and increase of power ability—was an imperative necessity at the time this money was furnished by Doud. The contract with the water company had been unsatisfactory, for two important reasons:   It was financially very burdensome, and, in connection with the city contract for lighting, was a source of loss, and not profit, to the defendant railway; and it was unreliable and insufficient to meet the demands upon the railway, even when added to the power furnished directly from the then existing railway power plant.   By special contract, the water company had temporarily extended its contract for furnishing of power to March, 1895.   Power must be had from some source.   The evidence conclusively shows no other source at Ottumwa was then open to the railway.   This acquirement—that is, continuance and increase—of power was a necessity to the railway to keep it a going concern in its several departments.   The only practicable method, under the evidence, to accomplish this necessity, appears to have been that which was adopted,— the erection of the building and supplying of this power by the railway.

(2) The railway was compelled to supply the electric lighting to the inhabitants of the city.   It could maintain itself—it could retain its municipal franchise—only by maintaining such equipment as was necessary to perform this lighting.   Intimately connected with this was that of furnishing electrical lighting for the city.   Except as related to the power part of the plant, the railway was equipped to do the city lighting as well as furnish lighting for private consumers.   The city had been supplied with the overhead equipment, which became largely, if not in this respect entirely, unremunerative to the railway, if it ceased to supply the city with lighting.   The evidence shows that the electrical lighting was the largest source of income to the railway of any of its departments.   A contract with the city was within reach, which, if carried out, would turn what had been a loss to the railway into a source of profit,—a desirable difference of some $4,000 in the profit and loss results.   I do not say that the mere fact that this new contract was advantageous to the railway would of itself justify the declaring of a preferential lien herein.   Only because it was so related to the other facts is that fact of large importance here.   As I view the matter, the retention of the city's lighting was a necessity to the defendant railway.   Without that, it could not maintain itself as a going plant; that is, a plant meeting its necessary expenses, unavoidable under the circumstances disclosed by the evidence.   So that, in my judgment, the building and machinery come under the head of necessities to the plant itself.   The evidence fails to disclose how, without this enlargement and increase of power, the plant could remain in operation as a plant in its several departments.

(3) Failure on the part of the railway to do that which depended on the power sought to be derived, and which was derived, from this building and machinery, would necessarily endanger the valuable

municipal franchise held by the railway. A loss of that franchise would work irreparable injury to the holders of bonds under the trust deed herein. That the railway was for pecuniary reasons unable to supply the lighting which its franchise bound it to supply would be no defense against an attempt to take away such franchise. It would constitute no defense that the railway could not furnish the power necessary for thus supplying electrical light, without building, and that it had no funds with which to build, etc. The railway must procure the funds necessary, it must obtain the power required, or give way to an electrical plant which would do these things. So that this building and increase of power were essential to the preservation of the rights of the holders of the bonds under the trust deed.

(4) The provisions of the trust deed—articles second and third—compelled the railway to obtain this power. If it had failed to do that which alone could supply this power, one of the conditions of the trust deed would have been broken, and a foreclosure might have been had therefor.

(5) It may be said additionally that a failure to supply the city lights would have thereby imperiled the property interests of the railway, in poles, wires, etc., already in the streets of the city, and thus have wrought large pecuniary damage to the corporation, and thereby to the bondholders under this trust deed.

Objection is urged that the additions were unnecessarily large,—a smaller expenditure might have been sufficient. The present holders of the bonds of defendant railway, and who alone are peculiarly interested in defeating intervener's (Doud's) preferential claim, do not appear to have then so regarded it. They are residents of the city where these additions were placed, and were then either bondholders or stockholders of the corporation. The evidence shows that they had knowledge of this contemplated and secured enlargement of power, and steps taken to secure same, and made no complaint. While it may be true, under the evidence as applied to past facts, that a smaller expenditure might have sufficed, yet we must not forget that what are now to us known facts then lay wholly in the future. There was the necessity of making proper allowances for temporary breakdowns in machinery, boilers, etc., and the necessity of some provision to meet same. The railway could not shut down for repairs, like a private corporation operating a sawmill or a factory. What would justify this shutting down in the latter might fall far short of justifying it in defendant railway. Its public and private lighting, the operation of its street-railway lines, and the furnishing of its heating facilities, demanded whatever precautions were reasonably necessary as to reserve ability to supply same and provide for accidents reasonably to be anticipated. Whether a prudent exercise of foresight in these matters would have actually required the full horse power in engine and capacity in boiler which were here added I will not undertake to decide. But the evidence fully satisfies me that there was no large, if any, expenditure of funds in the erection of building and purchase of machinery, beyond what general business prudence might properly have regarded as justifiably necessary under the circumstances then existing. The conclusion reached by

the master appears largely to be based on the fact that the contract with the city which was to be performed by the railway was a new contract, for whose performance, including the additional lights therein named beyond the former contract, the increased power became necessary.   This contract began its force at the termination of the former one with the city.   It was in this sense new.   It was also new in the sense that it included some additional lights; and also new in the increased (and profitable instead of losing) sum to be paid to the railway beyond that fixed in the former contract.   But, as above suggested, had the number of lights remained the same as under the former contract, there must have been an enlargement and increase of power procured by the railway, or such lights could not have been supplied and contract fulfilled.   And the additional lights included in the later contract were not of such amount, nor was the additional power required therefor so much greater, as that, under the evidence, the court could make any division, so that a part of this claim could be held preferential and a part denied, if such course were otherwise proper.   In my judgment, under the evidence, the later contract does not contain provisions so differing in these respects as to justify its being regarded as a new contract, in the sense of a different contract, and thus requiring this claim to be refused as preferential, where under the former contract it would have been allowed.

That intervener, Doud, was a stockholder and bondholder of defendant railway should not work refusal of his claim, if otherwise it would be allowed.   He furnished the money in good faith.   Of this the evidence leaves no room for doubt.   He furnished it upon the express agreement of the railway that he should be repaid out of the net current earnings.   While there was no specific source of earnings named, the master correctly finds from the evidence that such agreement was made, and that Doud relied upon it.   The evidence does not show that the present bondholders gave any express assent to this agreement.   But the evidence does show such a knowledge thereof on their part, and such silent acquiescence by them while Doud was furnishing the money, as that it would be inequitable to now compel Doud to lose the money so advanced by him, and which went into the plant they bid in, so that they have the benefit thereof either in the plant itself or in the amount to be distributed to bondholders, and was a necessity to its being properly kept as a going concern (which, according to the uncontradicted proof, added to the value of the plant a dollar for every dollar thus advanced by Doud therefor), and particularly when the foreclosure was brought on by them, by their demand on the trustee, before the current savings had reimbursed Doud, while a delay in the foreclosure of a very brief period would have resulted in his being entirely repaid, $2,500 having been already paid to him.   On the whole, I am of the opinion that intervener, Doud, is entitled to be allowed herein, as a preferential claim, so much of the money advanced by him therefor as went into the building and power supply, and remains unpaid.

What amount, then, thus remains?   In all, intervener, Doud, furnished $13,500.   Of this amount, $6,000 was with his assent paid to discharge interest falling due, and is disallowed as a preferential

89 F.—16

claim. This leaves $7,500 to be considered. How is the payment (the $2,500 by the railway paid to Doud) to be applied? Only $11,-500 in all remains unpaid to Doud. The evidence does not show any application by the railway nor by Doud of this $2,500, with reference to repayment of amount diverted to interest discharge or that expended for the building and power machinery. The general rules applicable, therefore, are to be applied, and we inquire where and how should this $2,500 be applied so that the result will be just and equitable to all parties interested? This question is not easily answered. The notes of the railway which evidence the indebtedness of the railway to intervener, Doud, do not assist here, since none of them indicate the directions in which the money, for whose advancement the notes were given, were to be applied, and therefore do not inform us, what the evidence has failed to show, whether the money applied on interest, or on building and purchase of machinery, etc., was to be repaid first, or if either was agreed to be first repaid. The general considerations which indicate where the court should apply the payment, where neither payor nor payee have made such application, are not present here. I am left, therefore, in grave doubt how this $2,500 should be applied. I am, however, inclined to regard favorably the suggestion that it should be applied to reduce the preferential claim. The railway appears indifferent as to how the application is made. Whether applied the one way or the other, the aggregate indebtedness of the railway is the same, the only difference being whether the amount due to this intervener or the trust deed indebtedness shall be lessened by the application of the payment. Intervener, Doud, failed to make application when the payment was made. He has waived his right thus to elect. The trustee and cestui que trust under the trust deed have heretofore had no opportunity to indicate an election as to this application. They now insist that the payment be applied on the $7,500 which went into the buildings and power supply. In the absence of other controlling considerations, I am inclined to make such application, although unable to state highly satisfactory reasons therefor. This application apparently avoids some of the difficulties attending any other application, and is beneficial to the only party who has heretofore not had opportunity, and waived the right, to elect how the payment should be applied.

Let order be entered overruling intervener's (Doud's) exceptions to the disallowance by the master as a preferential claim of the $6,000 applied to payment of interest, and sustaining the exceptions to intervener's claim for the remainder of the amount furnished by Doud (and included in his claim), which was applied to erection of building and procuring machinery, etc., for power supply, less the $2,500 payment. Counsel for intervener, Doud, will draft the necessary record entries, and submit same to opposing counsel; to all of which plaintiff and defendant and intervener, Doud, severally except.