ILLINOIS TRUST & SAVINGS BANK v. DOUD et al.

DOUD v. ILLINOIS TRUST & SAVINGS BANK et al.

(Circuit Court of Appeals, Eighth Circuit. November 21, 1900.)

Nos. 1,316, 1,317.

1. CORPORATION—NOT REQUIRED TO EXERCISE ALL POWERS.

No corporation is required to exercise all the powers granted to it as a condition of the exercise of any of them, unless such a requirement is expressly made in some statute or ordinance under which it obtains some of its powers and privileges, or its powers are inseparably connected with each other.

2. SAME—FORFEITURE OF FRANCHISE.

It is only for the violation of an express provision of the law under which a corporation derives its powers or privileges, or for such a misuse or nonuse of them as results in a substantial failure to fulfill the design and purpose of its organization, that a forfeiture of a franchise will be decreed.

3. RAILROAD MORTGAGE—PREFERRED CLAIM—INTEREST ADVANCED.

The claim of a creditor for money loaned to pay interest upon a prior mortgage debt is inferior in equity to the lien of a prior mortgage, and cannot be given a preference over it in the administration of the mortgaged property under a receivership in foreclosure.

**4. SAME—FORECLOSURE—PREFERRED CLAIM.**

A mortgagee of the property, acquired and to be acquired, and of the income, of a quasi public corporation, such as a railroad company, takes a lien on the net income after the current expenses of operation in the ordinary course of business are paid, and impliedly agrees that the gross income shall be first applied to the payment of these expenses.

**5. SAME.**

A court of equity engaged in administering mortgaged railroad property under a receivership in a foreclosure suit may, in its discretion, prefer unpaid claims for current expenses, incurred in the ordinary operation of the railroad within a limited time before the receivership, to the bondholders secured by a prior mortgage, in the distribution of the income or the proceeds of the mortgaged property; but the right to give such preference is confined to claims of this class.

**6. SAME—CLAIM FOR CONSTRUCTION.**

The broad language of the dicta in Fosdick v. Schall, 99 U. S. 235, 252, 25 L. Ed. 339, that "necessary operating and managing expenses, proper equipment, and useful improvements" are to be deducted from the current income before the net income out of which the mortgage is to be paid arises, has been disapproved and modified, and the class of claims entitled to equitable preference has been limited to those just mentioned, so as to exclude claims incurred for the construction of permanent and beneficial improvements to the mortgaged property outside the current expenses of its ordinary operation, by the later decisions of the supreme court in Kneeland v. Trust Co., 10 Sup. Ct. 950, 136 U. S. 89, 98, 34 L. Ed. 379; Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 11 Sup. Ct. 61, 137 U. S. 171, 196, 198, 34 L. Ed. 625; Thompson v. Railroad Co., 10 Sup. Ct. 29, 132 U. S. 68, 71, 73, 74, 33 L. Ed. 256; Thomas v. Car Co., 13 Sup. Ct. 824, 149 U. S. 95, 110, 37 L. Ed. 663; Southern Ry. Co. v. Carnegie Steel Co., 20 Sup. Ct. 347, 176 U. S. 257, 296, 44 L. Ed. 458; and Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 20 Sup. Ct. 363, 176 U. S. 298, 315, 44 L. Ed. 475.

**7 SAME—PREFERENTIAL CLAIM—TEST.**

The test of the equity which entitles the claim to preference over the mortgage in foreclosure is the consideration of the claim, whether it was or was not for a part of the current expenses of ordinary operation within a limited time before the receivership.

**8. SAME—RULE OF THE MARITIME LAW.**

The rule of the civil and maritime laws allowing priority to the last creditor who furnishes necessary supplies and repairs to conserve the thing has not been adopted by the supreme court in the distribution of the proceeds of the foreclosure of railway mortgages.

**9. SAME—NECESSITY OF CONSERVATION AND CONTRACT OF MORTGAGOR.**

Neither the fact that the consideration of the claim conserved the property and increased the security of the mortgagee, nor the fact that it was necessary to keep the mortgagor a going concern, nor the fact that the mortgagor pledged or mortgaged the current income to secure the payment of the claim, will raise a preferential equity in its favor, if its consideration was not a part of the current expenses of the ordinary operation of the property.

**10. SAME—DIVERSION OF INCOME.**

If a mortgagor diverts the current income from the payment of claims for current expenses which have this preferential equity to the payment of claims of other classes, so that current expenses remain unpaid when a receiver is appointed, the court may, out of the income accruing during the receivership, restore to the unpaid claims for current expenses the amount so diverted. But, if there has been no diversion, there can be no restoration, and the amount of the restoration may not exceed the amount of the diversion.

**11. SAME—MONEY LOANED FOR CONSTRUCTION PURPOSES.**

A loan to a quasi public mortgagor on a pledge or mortgage of its income of money to make a substantial, beneficial, and necessary addition

to its mortgaged property entitles the lender to no preference in equity in the distribution of the income or proceeds of the property over the claim of a prior mortgagee whose mortgage covered all the income and property of the mortgagor, acquired and to be acquired.

12. ESTOPPEL—MINORITY OF BONDHOLDERS CANNOT BIND MAJORITY THEREBY. The trustee of and the majority of the bondholders secured by a mortgage are not estopped from enforcing its lien by the knowledge, acts, or omissions of a minority of the bondholders.

Caldwell, Circuit Judge, dissenting.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Southern District of Iowa.

For opinion below, see 89 Fed. 235.

This appeal involves the right of a creditor of a mortgagor, a quasi public corporation, to a preference in payment over a prior mortgagee. On June 15, 1892, the Ottumwa Electric Railway, a corporation, engaged in furnishing steam heat and power, in operating a street railroad by electricity, and in furnishing electric light to the city of Ottumwa, executed a trust deed, which will hereafter be called a mortgage, to the Illinois Trust & Savings Bank, a corporation, to secure the payment of its 200 bonds of $1,000 each, which were issued and sold to bona fide purchasers. This mortgage covered the property of the mortgagor, acquired and to be acquired, and its rents, income, and profits. On March 28, 1896, the mortgagee filed its bill to foreclose this mortgage, and upon its request a receiver was appointed on April 14, 1896, to impound the income of the mortgagor under the mortgage for the benefit of the mortgagee. No accumulated income came to the hands of the receiver upon his appointment, and the order appointing him did not impose upon the mortgagee the payment of the claim of the intervener hereafter mentioned out of the income or the property as a condition of this appointment of the receiver. On June 15, 1896, Levi B. Doud intervened in this suit, and filed his petition, in which he prayed that he might have a lien upon the income collected by the receiver and upon the mortgaged property and its proceeds superior to that of the mortgagee for the sum of $11,000 and interest, which he had loaned to the mortgagor in 1894 and 1895 to enable it to construct an addition to its plant and to pay the accruing interest on its mortgage debt. The claim of the intervener was referred to a master in chancery, who found that $6,000 of it was for money loaned to pay an installment of interest on the mortgage debt, that $5,000 was loaned to enable the mortgagor to construct the addition to its plant, and that the intervener was not entitled to a preferential lien for any part of his claim. Exceptions were filed to this report, and the circuit court held that the intervener was entitled to a preferential lien for the $5,000 furnished to construct the addition, but was not entitled to such a lien for the $6,000 loaned to pay the interest, and rendered a decree accordingly, from which the mortgagee and intervener have appealed.

The facts disclosed by the record which are material to the issues presented by these appeals are these: The Ottumwa Railway, at the time it borrowed this money of the intervener, was engaged in three classes of business. It was operating a street railway by electrical power, it was furnishing steam heat and power to customers, and it was furnishing electric light to private customers and to the city of Ottumwa. It had a power plant with a boiler capacity of 750 horse power and an engine capacity of 600 horse power, and it had a lease of 190 horse power from the Iowa Water Company for a rental of $6,000 a year, which would expire on March 1, 1895. The three classes of business which this corporation was conducting were carried on together by the use of this power, but either class was susceptible of operation without the other, and the power which the mortgagor could produce at its own plant was ample to operate the railway, to furnish steam heat and power to its customers, and to furnish electric light to some, and probably to all, its private customers; but it was not sufficient to do these things and to furnish light to the city in addition. The mortgagor had acquired permission

from the city to operate the railway and to furnish electric light and power derived from other corporations by purchase. The permission to operate the railway was a separate permission, granted by separate ordinances; while the permission to erect poles, string wires, and to furnish electric light and power was another permit, granted by distinct ordinances, and entirely separate from the permission to operate the railway and to furnish steam heat and power. In the summer of 1894 the mortgagor was furnishing electric light to the city of Ottumwa under a contract which would expire on March 1, 1895, which entailed an annual loss of $2,700. The water company had passed into the hands of a receiver. Its contract to furnish 190 horse power would expire in March, 1895, and it was unable to furnish this power after that date; and the power it was furnishing was less than 190 horse power, and was unsatisfactory and inefficient. The mortgagor could operate its railway, furnish its steam heat and power, and probably supply its private customers with electric light from its own plant without this 190 horse power; but it could not do these things and also furnish the city with electric light without more power. The furnishing of electric light was the most profitable of its three occupations, but its contract to furnish this light to the city entailed a loss of $2,700 per annum upon it. The intervener, Doud, owned a majority of the capital stock of the mortgagor, and knew the facts and the situation of the railway company. Thereupon the railway company, about October 1, 1894, made a new contract with the city to furnish it electric light, which it estimated would yield it a profit of $4,000, and Doud agreed with it that he would loan to it the necessary funds to construct an addition to its plant and power, so that its available power should be raised from 600 horse power to 1,000 horse power, and that $6,000 of the money he loaned might be used to pay the installment of interest due on the mortgage December 1, 1894; and the mortgagor agreed with him that it would repay this loan after the addition had been paid for out of its current revenues. Thereupon the railway company constructed an addition to its plant, which consisted of a brick building 70 feet long and 44 feet wide, a Corliss engine of 400 horse power, a boiler of 250 horse power, and certain shafting and pulleys, at a cost of $19,000. It also constructed a half mile of track at an expense of $1,500. This addition was worth $19,000, and, without reckoning interest on the investment, or any deterioration, it effected a saving of $4,000 per annum in the operations of the company. The addition was worth $19,000, and the entire property of the company was worth $150,000. Between November 6, 1894, and October, 1895, the intervener loaned the mortgagor $13,000 for the purposes and under the agreement recited, and took its notes bearing 7 per cent. interest for this loan. Six thousand dollars of this money was used with the consent of the intervener to pay the interest on the mortgage which fell due December 1, 1894, and the larger part or all of the remainder was applied to paying for the addition. The installments of interest on the mortgage which fell due in June and December, 1895, were not paid. Meanwhile the mortgagor applied $2,000 of the current revenues of the railway company to the payment of its debt to Doud, and $10,000 more to payment for the addition to the plant, and then left $3,485.95 owing on machinery the title to which was retained by the seller until payment was made. The receiver, after his appointment, paid this sum and $2,152.33 for taxes, $2,726.76 for labor claims incurred just prior to the receivership, and $8,961.44 on account of paving bonds out of the current earnings of the property during the receivership. The holders of 58 of the bonds secured by the mortgage in suit resided in the city of Ottumwa, and knew in the fall of 1894 that the mortgagor was about to erect this addition to its plant, and that the intervener was to loan it money for that purpose, but they did not advise, consent to, or protest against it, and neither the trustee nor any of the holders of the majority of the outstanding bonds had any notice of these facts until after the addition was completed. After the commencement of this suit the Ottumwa bondholders bought the bonds of the nonresidents for 75 per cent. of their face value. The addition was built between November 1, 1894, and June 1, 1895, and, while the payment of the interest due December 1, 1894, with the money loaned by the intervener, prevented a default in the mortgage. The Ottumwa

bondholders declined to loan the money, or any of it, to the railway company to pay the installment of interest due December, 1894, or to construct the addition.

E. E. McElroy and H. Scott Howell, for Illinois Trust & Savings Bank, trustee.

William McNett (W. D. Tisdale, on the brief), for Levi B. Doud, intervener.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Is a loan to a quasi public corporation upon a pledge or mortgage of its current income to enable it to construct a substantial and beneficial addition to its plant, which was necessary to the maintenance of the volume of its business, but was not indispensable to its continuance as a going concern, entitled in equity to a lien upon the income or corpus of its property superior to the lien of a prior mortgage, which covered all its income, and all its property acquired before and after its execution? A careful examination of the record has convinced us that this is the question which this case presents. Counsel have earnestly argued that other issues are before us, and that this question is conditioned by other facts, and before we proceed with its discussion we will briefly notice these arguments, and state the reasons why they have not proved persuasive.

It is contended that the construction of the addition was necessary to keep the Ottumwa Electric Railway a going concern. This fact was alleged in the intervening petition, and the burden was on the intervener to establish it. The claim was made that the allegation was admitted in the answer, but the only admission there was that the new building and machinery were convenient and necessary to enable the railway to serve all its customers, including the city of Ottumwa, with electric light; but it was expressly denied that it was absolutely necessary or required to enable it to conduct its business and comply with its charter. The proof is conclusive that the railway was conducting three classes of business,—operating a street railway by electricity, furnishing steam heat and power, and furnishing electric light; that it could conduct either one or two of these occupations without the others or the other, and that it had ample power, without the new building and machinery, to operate its street railway, to furnish its customers with steam heat and power, and to furnish some of its customers with electric light. The evidence is undisputed that the most profitable of its three occupations was furnishing electric light, and that under its contract with the city the furnishing of this light to the city of Ottumwa was entailing a loss of $2,700 per annum upon it. The conclusion is irresistible that, if the railway had abandoned the furnishing of light to the city at the expiration of its contract, it would have retained all the profitable portion of its electric lighting, and would have saved an unnecessary expense of $2,700 per annum. There is no proof that this could not have been done. No witness goes further than to say that the new building and ma-

chinery were "an absolute necessity if we expected to continue in the city street-lighting business, and carry on the same amount of other lighting that we had up to that time." No witness *comes* to say that they were necessary to enable the railway to operate its street railway, to furnish its steam heat and power, and to furnish all its private customers with electric light. As the burden was on the intervener here, the conclusion of fact must be that the new building and machinery were necessary to enable the railway to continue furnishing electric light to the city, but that it could have conducted all its other business without them. This proof falls far short of establishing the proposition that the addition was necessary to keep the railway a going concern. It could have abandoned the furnishing of lights to the city and have conducted all its other business without the new building and machinery, without any loss, and with an assured gain of the $2,700 per annum it was losing on its contract with the city. It could have abandoned the business of furnishing electric light entirely, and have continued to operate its street railway and to furnish steam heat and power to its customers, or it could have abandoned all its business but the operation of its street railway, and it would still have been a going concern. The intervener not only failed to prove that the new building and machinery were indispensable to the maintenance of the railway as a going concern, but he clearly established the fact that they were not necessary for that purpose, and that they were only necessary to enable it to carry on a branch of its business—the lighting of the streets of the city—which had always entailed upon it a loss of $2,700 per annum.

But it is said that, if the railway had failed to make a new contract with the city and to light the city streets with electricity, its franchise would have been forfeited, and that in this way the construction of the new building and the purchase of the new machinery were indispensable to the continuance of its operation as a corporation. There are several answers to this proposition. Under its articles of incorporation the railway derived from the state power (1) to buy, construct, sell, lease, and operate street railways in Ottumwa; (2) to buy, construct, sell, lease, and operate a plant for furnishing steam heat and power; and (3) to buy, construct, sell, lease, and operate a plant to supply and furnish electric light to the city of Ottumwa and its inhabitants. This corporation derived the privilege of erecting its poles and stringing its wires along the streets of Ottumwa to furnish electric light from a set of ordinances entirely distinct from those which permitted the use of the streets of the city for its street railway and for its pipes to furnish steam heat and power. The ordinances relative to its electric lighting imposed no conditions upon its business of furnishing steam heat and power, or upon its business of operating the street railway. Now, conceding that the franchises of a public or quasi public corporation may be forfeited for misuse or renunciation, still the entire failure of this corporation to exercise its power to furnish electric light would have furnished no ground for the forfeiture of its franchises to furnish steam heat and power and to operate

its street railway. Another of the franchises granted to this corporation under its articles was the power to buy, hold, use, and sell the corporate stock of any competing corporations in the city of Ottumwa. None of the franchises to operate a street railway, to furnish electricity, or to furnish steam heat and power could have been forfeited because the corporation had not exercised its power to purchase the stock of rival corporations. No corporation is required to exercise all the powers granted to it by its organic law as a condition of the exercise of some of them unless that requirement is expressly made by some statute or ordinance under which it derives some of its powers or privileges, or the powers are inseparably connected with each other. Again, there is no evidence in this record that the franchise to furnish electricity to the inhabitants of the city and to the city itself would have been forfeited, or that any action to that end would have been instituted, if the railway company had not taken a new contract from the city to light its public places. No such action could have been maintained, in any event, before the city tendered to the railway a contract to pay a reasonable price for the lighting, demanded that the railway should furnish the light, and the latter refused. There is no evidence that the city ever took or contemplated any such action. The inference is unavoidable from the evidence that the new contract was not sought or obtained by the city, but was urged and secured by the corporation. The assertion that the franchise to furnish electric light would have been forfeited if none had been furnished to the city, has no evidence to support it, and, in the absence of evidence that action would have been taken to secure such a forfeiture, it was a contingency too remote, speculative, and uncertain to deserve the consideration of a court of equity. Not only this, but, when the ordinances of the city under which the railway is conducting its business of electric lighting are examined, it is found that they contain no provision or requirement that the corporation shall furnish electric light to the city, and the only provision for a forfeiture is contained in these words:

"In the event of said company, its successors and assigns, failing to comply with any of the provisions of this ordinance, or having their lights in operation within sixty days from the date of its acceptance of this ordinance, then it or they shall forfeit to the city of Ottumwa all rights given or permission granted under this ordinance."

As there was no provision in any of the ordinances which required the railway to furnish electric light to the city, or required the city to purchase electric light of the railway, and as one was a quasi public and the other a public corporation, each was left free to contract or to refuse to contract with the other on the subject, and neither would have forfeited any franchise it possessed by such a refusal. It is only for the violation of an express provision of the organic law under which a corporation derives its powers or privileges, or for such a misuse or nonuse of them as results in a substantial failure to fulfill the design and purpose of its organization, that a forfeiture of a franchise will be decreed. State v. Omaha & C. B. Railway & Bridge Co., 91 Iowa, 517, 526, 60 N. W. 121;

105 F.—9

State v. Farmers' College, 32 Ohio St. 487; State v. Commercial Bank of Cincinnati, 10 Ohio, 535; Harris v. Railway Co., 51 Miss. 602; Chicago City Ry. Co. v. People, 73 Ill. 541;. State v. Real-Estate Bank, 5 Ark. 595; State v. Societe Republicaine de Secours aux Emigres Francais de la Guerre, 9 Mo. App. 114. There is no basis in the law or in the facts of this case for the claim that any franchise of the railway would have been forfeited, or that it would thereby have been compelled to cease to be a going concern, if it had failed to furnish the city with electric lights.

Another position of counsel for the appellant is that by subdivision "b" of article 2 of the mortgage the railway was compelled to construct this new building and purchase the new machinery. That article reads as follows:

"Said company hereby covenants and agrees that so holding and enjoying the property, works, and plant hereby mortgaged, or expressed and intended so to be, that it will: (a) Pay all taxes and assessments thereon during the continuance of this mortgage; that it will not suffer any lien superior to the lien hereby created to attach to said works and plant or any part thereof. (b) Keep and maintain the property hereby mortgaged in good order and condition, and in active operation, and duly keep and observe all laws and ordinances lawfully enacted in any way relating to or affecting the franchises, easements, and privileges now owned or hereafter acquired by it. (c) At all times hereafter provide for and pay the principal and interest of and upon the bonds hereby or intended hereby to be secured, as the same shall become due and payable, according to the tenor and effect thereof."

The argument is that the provision that the mortgagor shall "duly keep and observe all laws and ordinances lawfully enacted in any way relating to or affecting the franchises, easements, and privileges now owned or hereafter acquired by it," required the mortgagor to construct the new building and purchase the new machinery in order to furnish electric light to the city of Ottumwa. That argument is answered by the fact that there was no ordinance or law which required the railway to furnish electric light to the city, or to make any contract with it concerning such light. It is further answered by the fact that the same article of the mortgage contained a covenant that the mortgagor would not suffer any lien superior to the lien created by the mortgage to attach to the mortgaged property, and it thereby covenanted that it would not permit the lien of this intervener to become superior to the lien of the mortgage. The conclusion is irresistible that neither the organic law of the railway, nor the ordinance under which it was operated, nor the provisions of the mortgage imposed any forfeiture of any franchise for its failure to furnish electric light to the city of Ottumwa, or required it to furnish such light, or to construct the additions to its plant and power under consideration, in order to enable it to continue a going concern.

It is contended that it is inequitable for the trustee and the bondholders to insist that the lien of their mortgage is superior to that of the intervener, because the Ottumwa bondholders knew that the addition. to the plant and power of the mortgagor was being made, and that the intervener was loaning the money to the mortgagor to assist in paying for it. But the residents of Ottumwa owned only 58 of the bonds, while the majority of them were held

by nonresidents, who knew nothing of the construction of the addition or of the loan of the intervener until after the new building was erected and the new machinery was purchased. The bondholders in Ottumwa could not, by their action, estop the trustee or the majority of the bondholders; and, if the intervener has any claim against the residents who held these 58 bonds, it is against them individually, and not against the trustee, or the mortgagees, which it represents. Moreover, the Ottumwa bondholders did not advise, consent to, or request the loan from the intervener, and he was not induced to make it by any of their acts or omissions. The mortgage which secured them was of record, and contained a covenant that the mortgagor should make no lien superior to theirs. The intervener knew this fact, and made his loan in the face of it. The bondholders had the right to believe, and doubtless did believe, that he had advanced his money upon the credit of the mortgagor, and that he took his rights subject to the lien of their mortgage. The facts constitute no estoppel against them from insisting upon their prior lien. There is nothing unjust nor inequitable in their position, and the fact that after the commencement of this suit they purchased the bonds of the nonresidents in no way changes the situation.

It is argued that the claim of the intervener to a superior lien has some equity in it in some way, because before the suit to foreclose the mortgage was commenced $10,000 of the current income of the mortgaged property was applied to payment for the construction of the addition to the plant and power, and because, subsequent to the appointment of the receiver, the latter has paid from the current income which he received taxes, labor claims, paving bonds, vendors' liens upon machinery purchased, and repairs, to the amount of more than $17,000. It is claimed that these acts constitute a diversion of the income, and that this diversion establishes an equity in favor of the intervener. The argument and claim are based on a misapprehension of the character and effect of a diversion of income which will establish a preference in equity. Unpaid claims for the current operating expenses of a quasi public corporation for a limited time anterior to the receivership have a superior equity to the lien of the bondholders under a prior mortgage. It is the diversion of the income of the mortgaged property from these claims, which have a superior equity to the claim of the bondholders, that forms one of the grounds of the preferential lien which is vouchsafed to them. But it is only when the income is diverted from the payment of these claims which have a higher equity to the payment of those which stand upon a lower plane that any equity arises in favor of anyone on account of diversion. In Fosdick v. Schall, 99 U. S. 235, 253, 254, 25 L. Ed. 339, Chief Justice Waite said that, if the officers of the company "give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. * * * Whatever is done, therefore, must be with a view to a restoration by the mortgage

creditors of that which they have thus inequitably obtained. It follows that, if there has been in reality no diversion, there can be no restoration, and that the amount of restoration should be made to depend upon the amount of the diversion." Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Union Trust Co. v. Illinois M. R. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Wood v. Safe-Deposit Co., 128 U. S. 416, 420, 421, 9 Sup. Ct. 131, 32 L. Ed. 472. Now, in the case in hand there never was any diversion of the current income from the payment of the operating expenses of the railway which was not fully restored by the payment of the labor and other claims which the receiver satisfied. All the operating expenses have been paid, and no unpaid claims on their account, no claims on account of money loaned to pay for material, supplies, or labor used in the operation of the property of this railway, are presented to the court, or are in existence. The claim of the intervener is for money loaned to pay interest on the mortgage debt, to construct a new brick building 70 feet long and 44 feet wide, and to purchase new machinery which increased the available power of the mortgagor $66\frac{2}{3}$ per cent. The cost of this new building and machinery was $19,000. Its erection was not one of the current operating expenses of the mortgagor, but was an original construction for the purpose of increasing its capacity and power. The question whether or not the claim for the money loaned for this construction was superior in equity to that of the mortgagee will be subsequently considered. Whether it was or not, there was no diversion of the income from the payment of a claim of superior equity to the payment of one of inferior equity. The $10,000 which was taken from the income to pay for the construction of the addition was applied to the same purpose, and stood upon the same plane in equity, as the claim of the intervener for the money he loaned for the same purpose. The income applied by the receiver to the payment of vendors' liens upon the machinery, taxes, paving bonds, and repairs was applied to the payment of claims of equal or superior equity to that of the intervener. There was, therefore, no diversion of the current income of the mortgagor from the payment of claims of superior equity to the payment of claims of inferior equity, and hence no equity in support of the claim of the intervener upon this ground.

It is claimed that the $6,000 used to pay the interest on the mortgage debt, which accrued on December 1, 1894, was loaned to pay for the construction of the addition to the power and plant, and not to pay the interest on the bonds. The testimony upon this subject is that the intervener agreed to loan to the mortgagor the necessary money to enable it to construct the contemplated addition to its plant and power in consideration of the agreement by the railway to apply its current income, after the addition was paid for, to the payment of the loan made by the intervener. Pursuant to this agreement, he loaned to the company $1,500 on November 7, 1894, for which he took its promissory note. Pursuant to the same agreement he loaned it on November 27, 1894, $6,000, for which he took its promissory note; and at the time of the loan

he agreed that this money might be used to pay the interest on the mortgage bonds which fell due on December 1, 1894, and it was so used pursuant to that agreement. The legal effect of the facts disclosed by this evidence was that the intervener loaned this $6,000 to the mortgagor to enable it to pay its interest on the mortgage debt in consideration of the agreement of the mortgagor to apply its current income, after payment had been made for the new addition, to the payment of this loan. The effect of this loan was to prevent the mortgagee from foreclosing its mortgage for default of this interest, and to keep the property in the control of the mortgagor until the contemplated addition was completed. The claim of a creditor for money loaned to pay interest on a mortgage debt is inferior in equity to the lien of a prior mortgage, and cannot be given a preference over it. This proposition is conclusively established by Penn v. Calhoun, 121 U. S. 251, 252, 7 Sup. Ct. 906, 30 L. Ed. 915; Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 196, 11 Sup. Ct. 61, 34 L. Ed. 625; Southern Development Co. v. Farmers' Loan & Trust Co., 24 C. C. A. 497, 79 Fed. 212, 215; United States Trust Co. v. Western Contract Co., 26 C. C. A. 472, 81 Fed. 454, 464. In Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 196, 11 Sup. Ct. 68, 34 L. Ed. 634, Mr. Chief Justice Fuller, in delivering the opinion of the supreme court, upon this question aptly said:

"So far as disclosed, the interest coupons were paid, not purchased (Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868; Wood v. Safe-Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472), and cannot be set up as outstanding; and the contention is wholly inadmissible that the bondholders, because they received what was due them, should be held to have assented to the running of the road at the risk of returning the money thus paid, if the company, by reason of unrealized expectations on the part of those who made the advances, should ultimately turn out to be insolvent, and unable to go on. By the payment of the interest, the interposition of the bondholders was averted. They could not take possession of the property, and should not be charged with the responsibility of its operation. It is true that a railroad company is a corporation operating a public highway, but it does not follow that the discharge of its public excuses it from amenability for its private obligations. If it cannot keep up and maintain its road in a suitable condition, and perform the public service for which it was endowed with its faculties and franchises, it must give way to those who can. Its bonds cannot be confiscated because it lacks self-sustaining ability. To allow another corporation, which for its own purposes has kept a railroad in operation in the hands of the original company, by enabling it to prevent those who would otherwise be entitled to take it from doing so, a preference in reimbursement over the latter on the ground of superiority of equity, would be to permit the speculative action of third parties to defeat contract obligations, and to concede a power over the property of others which even governmental sovereignty cannot exercise without limitation. And if all these advances should be considered as applied in payment of the operating expenses only, upon the theory, where such was not literally the fact, that they supplied a deficit created by the payment of interest out of the gross earnings, the same remarks would be applicable."

The $6,000 loaned by the intervener on November 27, 1894, was loaned for and applied to the purpose of paying accruing interest on the mortgage bonds, and the claim for it is entitled to no preferential lien upon the corpus or income of the property covered by the mortgage prior to it. But $5,000 of the amount due the intervener

was loaned to enable the mortgagor to pay for the addition to its plant and power, and the question recurs, is a loan to a quasi public mortgagor, upon a pledge or mortgage of its income, of money to make a substantial and beneficial addition to its plant and power, which was necessary to enable it to maintain the volume of its business, but which was not indispensable to enable it to continue a going concern, entitled in equity to a lien upon the income or corpus of the property superior to the lien of a prior mortgage which covered all its income and all its property, acquired and to be acquired? The order appointing the receiver did not require him to pay claims of this character in preference to the mortgage debt out of the income or proceeds of the property, and the authorities which rest upon such an order (Dow v. Railroad Co. [C. C.] 20 Fed. 269; Central Trust Co. v. Texas & St. L. R. Co. [C. C.] 22 Fed. 135; Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co. [C. C.] 53 Fed. 182) do not rule this case. Nor is the decision in Central Trust Co. v. Wabash, St. L. & P. Ry. Co. (C. C.) 30 Fed. 332, which seems to be relied upon by counsel for intervener, even persuasive upon the issue here presented. It is said that in that case unsecured claims to the amount of more than $3,000,000 were allowed and given a preference in payment over a prior mortgage, and that $2,200,000 of these preferential claims were for moneys borrowed by the mortgagor, after the mortgage was recorded, to complete its lines of railroad, and make improvements upon its system; and it is claimed that the decision in that case is an authority for the proposition that it is within the power and province of a court of equity to impose upon a mortgaged property superior liens for such claims against the seasonable protest of the holders of bonds secured by the mortgage. This claim is founded on a complete misapprehension of the question presented, and of the scope and effect of the decision in that case. It is true that in the earlier administration of the receivership of the Wabash Railway System more than $3,000,000 of floating indebtedness was given a preference in payment over a prior mortgage, and that $2,200,000 of this indebtedness was for money borrowed by the railway company "for the meeting of its expenses and the keeping its road in successful operation and completing its lines"; but how was this result accomplished? Did the court decide in 30 Fed., against the objection of the mortgage bondholders, that such preferences could lawfully be made, and then make them? Not at all. The mortgagor filed the bill which instituted that suit, and the court in its original order appointing a receiver upon that bill, which was made before the mortgagees had appeared in the suit, or made any demand of the income, or any claim to the property or its proceeds, directed the receiver to first protect and pay this floating indebtedness. Certainly, that order did not decide that claims for money borrowed for the construction or completion of a railroad were entitled to preference over the mortgagees, because, until the mortgagees made demand for the income, or commenced a foreclosure of their mortgages, they had not impounded the income, and either the mortgagor or the court could properly apply it to the payment of unsecured

debts. Railroad Co. v. Cowdrey, 11 Wall. 459, 463, 20 L. Ed. 199; Dow v. Railroad Co., 124 U. S. 652, 8 Sup. Ct. 673, 31 L. Ed. 565. After the receivers were appointed upon the bill of the mortgagor, a suit was commenced to foreclose a junior mortgage upon the entire Wabash Railway System, and this latter suit was consolidated with that brought by the mortgagor, and a decree of foreclosure and sale, subject to the rights of the creditors secured by underlying mortgages upon various lines which constituted the system, was rendered. This decree gave to the claims based on this floating indebtedness of the mortgagor a preference in payment over this junior mortgage, but the decree was not the result of a decision upon the rights of the mortgagees as against the claimants for these preferences. It was rendered in their presence, and without objection on the part of the trustees of the various mortgages. The trustees of the underlying mortgages and of the junior mortgage which was foreclosed were parties to the suit, and the decree "was signed and entered, all parties in interest present, and none objecting." Central Trust Co. v. Wabash, St. L. & P. Ry. Co. (C. C.) 30 Fed. 335. Not only this, but no attempt had ever been made to set aside the orders which were made at the inception of the receivership that these unsecured debts should be first paid out of the income and the proceeds of the mortgaged property. Id. 340. Under this decree, to which the trustees of the various mortgages had silently assented, a sale had been made, and a purchasing committee had bought the property. Then it was that the case arose in 30 Fed. which is presented and relied upon by counsel, and it arose in this way: After the purchasing committee had bought the property under this decree, some of the bondholders who were secured by underlying mortgages upon some of the lines of railway which constituted a part of the Wabash System petitioned the court to direct the receivers or the purchasers at this sale to pay taxes upon the lines covered by their mortgages, and to pay the interest upon their bonds. The court held that they were estopped by the presence and silence of their trustees, who represented them, and by their own silence while the decree was rendered and the sale was made, from questioning its terms, or the rights of the purchasers to the property, without the imposition of additional burdens. The question in that case, and the only question presented and decided, was whether or not the decree was a contract between the court and the purchasers under it, so that it could not be changed after the sale, at the suit of bondholders, whose trustees had silently assented to it; and the court held that it was such a contract. The question whether or not claims for money loaned for the construction of parts of the railroad were entitled to preference in payment over the mortgages was not decided. Those claims had been allowed a preference by consent, and the case is no authority upon the issue before us.

Returning to the question, the contention of the intervener is that it should be answered in the affirmative, because the new building and machinery, to construct and purchase which he loaned his money, conserved the mortgaged property, increased the security

of the mortgagee to the full amount expended upon it, and made its operation more economical; and because the mortgagor agreed with him to apply the current income of the property to the payment of his loan after payment for the building and machinery had been completed. On the other hand, the mortgagee insists that it should be answered in the negative, because it is only current debts arising in the ordinary course of the business of a quasi public corporation within a limited time before the appointment of a receiver that are entitled to a preference in payment over a prior mortgage, and this is not such a debt. It strenuously maintains that neither the fact that the money borrowed was used to preserve the property, increase the security, and make the operation of the plant more economical, nor the fact that the mortgagor agreed to repay it out of the current income, have taken this debt out of the class of unpreferred claims, and transferred it to the class preferred in equity, or displaced the lien of the prior mortgage, in the face of which the intervener loaned his money and took his contract and his chances. It is certain that the expense of constructing this new brick building 70 feet long and 44 feet wide, and the purchase of this new machinery at an expense of $19,000, to make an addition to a plant worth only $150,000, and which increased the available power of the mortgager $66\frac{2}{3}$ per cent., cannot be held to be one of the current operating expenses of the corporation incurred in the ordinary course of its business. The work for which the money was loaned was a work of construction and enlargement, and not a work of operation. Was the claim for the money borrowed to carry on this work of construction entitled to a lien on the mortgaged property and its income superior to that of the prior mortgagee? This court has held that the replacing of an old gear wheel and pinion worn out in service by a new one was one of the current expenses of the operation of a cable railway, and that the claim for the purchase thereof was entitled to a preference in payment over a prior mortgage (Trust Co. v. Clark, 81 Fed. 269, 26 C. C. A. 397, 49 U. S. App. 453); and that a claim for personal injury caused by the negligence of a railroad company in the operation of its road was entitled to no such preference (Trust Co. v. Riley, 70 Fed. 32, 16 C. C. A. 610, 36 U. S. App. 100). But it has never answered the question now in hand. We turn to the decisions of the supreme court for the answer.

In 1862 the question was presented to the supreme court in Dunham v. Railway Co., 1 Wall. 254, 267, 17 L. Ed. 584. In that case a mortgage was made upon a "road built and to be built" before the railroad was completed. The railway company, the mortgagor, was unable to finish it. Thereupon it delivered possession of its uncompleted railroad to a contractor, who agreed to finish it, and stipulated with him that he was to have and keep possession and control of the section of the road which he engaged to complete, and its earnings, until the company should make full payment to him of whatever amount it should owe him under the contract; that, until he was fully paid, he should operate the road, and apply the earnings—First, to payment for operation; second, to reim-

bursing himself for all money which he might advance; and, third, to the payment of the interest on the mortgage bonds. The railroad was worthless in the condition in which he found it. He completed the section whose possession was delivered to him, and by the expenditure of his own money made the railroad available and operative, and increased the security of the mortgagees. The trustee of one of the mortgages filed his bill to foreclose it. The contractor insisted that under his contract with the mortgagor, and in view of the fact that his action had conserved the property, and increased the security, he was entitled to a prior lien upon the income and proceeds of the property over the lien of the mortgage. The supreme court said:

"Contractor, under the circumstances, could acquire no greater interest in the road than was held by the company. He did not exact any formal conveyance, but, if he had, and one had been executed and delivered, the rule would be the same. Registry of the first mortgage was notice to all the world of the lien of the complainant, and in that point of view the case does not even show a hardship upon the contractor, as he must have known, when he accepted the agreement, that he took the road subject to the rights of the bondholders. Acting, as he did, with a full knowledge of all the circumstances, he has no right to complain if his agreement is less remunerative than it would have been if the bondholders had joined with the company in making the contract. No effort appears to have been made to induce them to become a party to the agreement, and it is now too late to remedy the oversight."

In 1870 the same question arose in Railroad Co. v. Cowdrey, 11 Wall. 459, 464, 481, 482, 20 L. Ed. 199. In that case the railroad company had given three mortgages upon its uncompleted railroad, which covered its income and its after-acquired property. After these mortgages had been made, there remained five miles of railroad between Galveston City and Virginia Point which were not constructed, and which the railroad company was unable to build. Thereupon it made a fourth deed of trust to one Tucker, as trustee for Robert Pulsford, to secure his payment for the iron that was to be used and that was used in laying the track of this five miles of railroad, and for the money advanced to build it. In this mortgage it was expressly agreed that Pulsford should have a special lien on the railroad iron which was used in the construction of this railroad from Galveston City to Virginia Point. The trustees of the prior mortgages brought suits to foreclose them. Pulsford intervened, and claimed a first lien on the portion of the road laid with his rails. He insisted that when the prior mortgages were made that part of the road was not in existence; that the mortgagor had been unable to build it; that without it the previous work done was worthless; that his iron saved the railroad, rendered it capable of being used; and that on the principle adopted by the civil and maritime laws of awarding priority to the last creditor who furnished necessary repairs and supplies to a vessel he was entitled to priority. Pages 465, 480, 11 Wall., and pages 202, 206, 20 L. Ed. The supreme court said:

"As to the first point, without attempting to review the many authorities on the subject, it is sufficient to state that, in our judgment, the first, second, and third deeds of trust or mortgages given by the Galveston Railroad Company to the trustees, estops the company, and all persons claiming under it and in

privity with it, from asserting that those deeds do not cover all the property and rights which they profess to cover. Had there been but one deed of trust, and had that been given before a shovel had been put into the ground towards constructing the railroad, yet, if it assumed to convey and mortgage the railroad, which the company was authorized by law to build, together with its superstructure, appurtenances, fixtures, and rolling stock, these several items of property, as they came into existence, would become instantly attached to and covered by the deed, and would have fed the estoppel created thereby. No other rational or equitable rule can be adopted for such cases. * * * Mr. Pulsford, as holder of the fourth mortgage, is an assignee of the railroad company, claiming under it, with full notice of the other mortgages. He is in privity with the company, and is bound by the estoppel. As to the other point,—giving priority to the last creditor for aiding to conserve the thing,— all that is necessary to say is that the rule referred to has never been introduced into our laws except in maritime cases, which stand on a particular reason. * * * By the common law it is an inflexible rule that whatever is affixed to the freehold becomes a part of the realty, except certain fixtures erected by tenants, which do not affect the question here. The rails put down on the company's road became a part of the road. The road itself was included in the mortgages of the complainants. Pulsford, by allowing his property to go into or become part of the road, consented to its being covered by the mortgages in question. He acquired no lien which can displace them." Pages 480–482, 11 Wall., and pages 206, 207, 20 L. Ed.

In Hale v. Frost, 99 U. S. 389, 391, 392, 25 L. Ed. 419, in a suit to foreclose a mortgage upon a railroad, Hale, Ayer & Co. intervened, and asked to be allowed a preference in payment of their claim, a part of which was for supplies furnished to the machinery department of the company, and used in the ordinary operation of the road, and a part for materials for construction purposes. The court held that the interveners were entitled to a preference in payment over the bondholders secured by the prior mortgage as to so much of their claim as was for supplies furnished and used in the ordinary operation of the road, but that they were not entitled to any preference in the payment for the material they had furnished for construction purposes.

In 1886, in Porter v. Steel Co., 120 U. S. 649, 671, 7 Sup. Ct. 741, 30 L. Ed. 830, in suits to foreclose prior mortgages which covered the income and after-acquired property of the mortgagors, the interveners had furnished the money with which large portions of the railroad were constructed, had thereby made the security valuable which was before nearly worthless, and a railroad operative which could not have been successfully operated without the completion of the lines built with the money of the interveners. They presented their claim for a preference in payment over the bondholders secured by the prior mortgages out of the income and proceeds of the mortgaged property. The circuit court sustained their claim, and entered a decree accordingly. The supreme court reversed the decree, and said:

"The claims of the appellees are for the original construction of the railroad. This is not a case where the proceeds of the sale of the property of a railroad, as a completed structure, open for travel and transportation, are to be applied to restore earnings which, instead of having been applied to pay operating expenses and necessary repairs, have been diverted to pay interest on mortgage bonds and the improvement of the mortgaged property; the debts due for the operating expenses and repairs having remained unpaid when a receiver was appointed. The equitable principles upon which the decisions rest applying

to the payment, out of the proceeds of the sales of railroad property, of such debts for operating expenses and necessary repairs, are not applicable to claims such as the present, accrued for the original construction of a railroad while there was a subsisting mortgage upon it. These five appellees gave credit to the company for their work. It was construction work, and none of it was for operating expenses or repairs, and none of it went towards keeping a completed road in operation, either in the way of labor or of material. When these claims accrued, the road of the company had not been opened for use. The claims accrued after the mortgage had been executed and recorded, and after $1,000,000 of the bonds secured by it had been issued and pledged to innocent bona fide holders for value. We are not aware of any well-considered adjudged case, which, in the absence of a statutory provision, holds that unsecured floating debts for construction are a lien on a railroad superior to the lien of a valid mortgage duly recorded, and of bonds secured thereby, and held by bona fide purchasers for value. The authorities are all the other way."

In Wood v. Safe-Deposit Co., 128 U. S. 416, 420, 421, 9 Sup. Ct. 131, 32 L. Ed. 472, which was decided in 1888, one Starr, who had raised money to defray the expenses of the construction of waterworks upon the property mortgaged, and who for all purposes of the case stood in the shoes of the mortgagor, had paid 117 coupons with funds which he had raised for construction purposes. After he paid them, he delivered them to contractors in payment for materials they furnished to construct the plant, and they insisted that Starr's failure to apply the money he raised to the payment of the expenses of construction was a diversion of the fund which enabled them to obtain priority, under the doctrine of Fosdick v. Schall. But the supreme court answered:

"The argument is unsound. There are several answers to it. First, it overlooks the vital distinction between a debt for construction and one for operating expenses. The doctrine of Fosdick v. Schall is applicable wholly to the latter class of liabilities. In the case of Cowdrey v. Railroad Co., 93 U. S. 352, 23 L. Ed. 950, it was settled that the doctrine does not apply where it is a question of original construction. Secondly, it overlooks the important fact that the doctrine only applies where there is a diversion of the income of a 'going concern' from the purpose to which that income is equitably primarily devoted, viz. the payment of the operating expenses of the concern."

In Thompson v. Railroad Co., 132 U. S. 68, 73, 74, 10 Sup. Ct. 29, 33 L. Ed. 256, decided in 1889, the White Water Valley Railroad Company had been organized to construct and operate a railway from Hagerstown, in Indiana, to Harrison, on the boundary line between that state and Ohio. It had made a mortgage upon its property, acquired and to be acquired, and its income, to secure the payment of certain bonds which it issued. It had constructed its road from Harrison to Cambridge City, leaving the distance from the latter place to Hagerstown, between seven and eight miles, unconstructed. It was without means to equip the railroad constructed, or to construct the portion not yet built. It leased its road to another company to complete the construction, equip, and operate it. The lessee made a contract with Benjamin E. Smith and Henry C. Lord to construct the remaining portion of the line, and issued certificates to those contractors for the money expended by them in the work of construction. The lessor and lessee united in executing and delivering a mortgage upon the section of the railroad built by Smith and Lord in trust to secure the holders of the certificates mentioned, and agreed that those holders should have

a perpetual lien upon all the earnings of the line constructed by means of these certificates to secure the payment of the semiannual interest due upon the certificates. The mortgage was foreclosed without making Smith and Lord or the holders of the certificates parties, and a purchaser under the decree claimed the road free from the lien of the certificates and the mortgage made to secure them. The holders of the certificates brought suit to enforce their lien. They insisted that they were entitled to a prior lien upon the section which had been built with the money obtained by the certificates, because that money conserved the road and increased the security of the mortgagees, and because they had an express agreement with the mortgagor to apply the portion of the railroad which this money built and the income of it to the payment of these certificates. The supreme court said:

"The claims of the complainants, whatever validity and force may be given to them as liens upon the earnings of the section of road from Cambridge City to Hagerstown, between the parties agreeing to such liens, are entirely subordinate to the rights of the bondholders under the mortgage of the White Water Valley Railroad Company, executed for their benefit to trustees on the 1st of August, 1865. * * * The decision in the case of Railroad Co. v. Cowdrey also covers the only plausible position of the complainants, that they have a lien upon the earnings of the section, because with their moneys the road over it was constructed. But the work was not done at the request of the mortgagees, but upon a contract with the lessee of the road, which had stipulated as one of the considerations of the lease to construct that part of the line. With those contractors the bondholders, secured by the mortgage of August 1, 1865, had no relations, and incurred no obligation to them. In the case cited it was contended that priority should be given to the last creditor for aiding to conserve the road. But the court answered that this rule had never been introduced into our laws, except in maritime cases, which stand on a particular reason; that by the common law whatever is affixed to the freehold becomes part of the realty, except certain fixtures erected by tenants, which do not affect the question; and that the rails put down upon the company's road become a part of the road. Here the same rule applies, and not only the rails, but those permanent fixtures which are essential to the successful operation of the road, become a part of the property of the company, as much so as if they had existed when the mortgage was executed."

In Railroad Co. v. Hamilton, 134 U. S. 296, 298, 299, 301, 10 Sup. Ct. 546, 33 L. Ed. 905, decided in 1890, the Toledo, Delphos & Burlington Railroad Company made a mortgage in 1880 upon its property, acquired and to be acquired, and its income, to secure bonds which were subsequently issued thereunder. In 1883 that railroad company made several contracts with one who subsequently became the intervener in a suit to foreclose that mortgage, to the effect that he should construct a dock for it in the city of Toledo, and he fulfilled the contract. The railroad company failed to pay the contract price, and he sought priority over the mortgage bondholders in payment out of the income and proceeds of the mortgaged property. The circuit court sustained his claim. The supreme court reversed the decree, held that no act of the mortgagor and third parties could displace the lien of the mortgage in favor of a claim for money due for construction of additions to the property mortgaged, and, among other things, said:

"Neither did the fact of the construction of the dock, and the subsequent improvement of the mortgaged property, give, as reported by the master, to

Hamilton an equitable lien prior in right to the lien of the mortgage, or furnish equitable reasons why the legal priority belonging to the mortgage should be displaced. It is true cases have arisen in which, upon equitable reasons, the priority of a mortgage debt has been displaced in favor of even unsecured subsequent creditors. See St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832, in which many of these cases are collected, and the equitable principles underlying them stated. But those principles have no application here. The work which Hamilton did was in original construction, and not in keeping up, as a going concern, a railroad already built. The amount due him was no part of the current expenses of operating the road. There was, as to him, no diversion of current earnings to the payment of current expenses."

In Southern R. Co. v. Carnegie Steel Co., 176 U. S. 257, 259, 296, 20 Sup. Ct. 347, 44 L. Ed. 458, and Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 44 L. Ed. 475 (cases which were decided in 1900), the supreme court had occasion again to consider the question before us. In the former case the Richmond & Danville Railroad Company, the mortgagor, had been engaged in operating a system of railroads comprising 3,320 miles. The Carnegie Steel Company had sold to the mortgagor, shortly before the appointment of receivers in the suit to foreclose the mortgage upon it, 4,203 tons of rails, which were necessary to replace old and worn rails upon the various lines of railroad operated by the mortgagor. These rails conserved the property and increased the security. The supreme court held that the claim for these rails was for a part of the operating expenses of the railroads of the mortgagor, and that it was entitled to preference in payment over the claim of the prior mortgagee. In the latter case, the Houston & Texas Central Railway Company, the mortgagor, was operating 521 miles of railroad. In the years 1882, 1883, and 1884 it purchased 18,581 tons of rails, which were indispensable to the maintenance of the company as a going concern, and which were used to replace old and worn rails upon the roads operated by the mortgagor. Half the purchase price of these rails remained unpaid. The claimant for this unpaid purchase price insisted that it was entitled to a preference in payment over the mortgagee out of the income and proceeds of the Waco & Northwestern Division of the mortgagor's railroad system, which consisted of 58 miles, 37 miles of which were relaid with rails furnished under the contracts with the mortgagor. The court held that the purchase price of these rails was not a part of the ordinary expenses of operating the railroad, and refused to allow a preference to the claim. Counsel for the claimants in each of these cases earnestly and persistently urged that these rails were necessary to the operation of the railroad, that they conserved the property, that they increased the security, and that for these reasons the claims should be preferred. In the former case the supreme court held the purchase price of the small quantity of rails in that case one of the ordinary expenses of the operation of the railroad, and then said:

"We must not be understood as saying that a general unsecured creditor of an insolvent railroad corporation in the hands of a receiver is entitled to priority over mortgage creditors in the distribution of net earnings, simply because

that which he furnished to the company prior to the appointment of the receiver was for the preservation of the property and for the benefit of the mortgage securities. That, no doubt, is an important element in the matter. Before, however, such a creditor is accorded a preference over mortgage creditors in the distribution of net earnings in the hands of a receiver of a railroad company, it should reasonably appear from all the circumstances, including the amount involved and the terms of payment, that the debt was one fairly to be regarded as part of the operating expenses of the railroad, incurred in the ordinary course of business, and to be met out of current receipts." Page 296, 176 U. S., page 362, 20 Sup. Ct., and page 475, 44 L. Ed.

In the latter case the court declared:

"The principal ground upon which the Lackawanna Company bases its claim for the relief asked is that when each of the above contracts was made the Waco division was in such condition that new rails were imperatively required in order that the road might be safely used for the transportation of persons and property. Such, it may be assumed, was the condition of the road when the rails were contracted for and delivered; for it was so found by the master to whom the intervening petition of the Lackawanna Company was referred with direction to take the account prayed for, and to report the facts, and to that report no exceptions were filed. * * * This court has uniformly held that in the distribution of the current earnings of an insolvent railroad company, whose property is being administered by a receiver, mortgage creditors could not be postponed to unsecured creditors, unless the debts due the latter were of the class known as current debts arising in the ordinary course of business, and properly chargeable upon current receipts. The decision in each case has been more or less controlled by its special facts. But we are of opinion that such expenditures as those incurred in the making of the contracts with the Lackawanna Company were not such as are made in the ordinary course of the operations of a railroad, and cannot be deemed current debts within the rule that a railroad mortgagee, when accepting his security, impliedly agrees that the current debts of a railroad company, contracted in the ordinary course of its business, in order to keep it a going concern, shall be paid out of current receipts before he has any claim upon such income. Southern R. Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, and authorities there cited. They are rather to be regarded as extraordinary expenditures, outside of the ordinary course of business, and incurred for purposes not of repair, but of construction. This court has said that it is the exception, not the rule, that the priority of mortgage liens can be displaced. Kneeland v. Trust Co., 136 U. S. 89, 98, 10 Sup. Ct. 950, 34 L. Ed. 379; Thomas v. Car Co., 149 U. S. 95, 111, 13 Sup. Ct. 824, 37 L. Ed. 663. We have said that priority of unsecured claims is recognized only in a few specified cases in which equity and good conscience require that the vested liens of mortgage creditors shall be postponed in the application of current earnings to current debts. Sound principle forbids that a court of equity should imply an agreement upon the part of mortgage creditors to subordinate their claims to such debts as those due to the Lackawanna Company. To so hold would place their rights at the mercy of the railroad company having charge of the property upon which their recorded liens rest."

This is the last decision of the supreme court upon the question in dispute to which our attention has been called.

The authorities to which we have now adverted establish the propositions that a claim for money borrowed or for service rendered or material furnished to construct a necessary, permanent, and beneficial improvement or addition to the mortgaged property of a quasi public corporation is not entitled in equity to a preference in payment out of the mortgaged property or income over the claims of the bondholders secured by the lien of the prior mortgage, in the face of which the claim accrued; and that neither the fact that the consideration of the claim conserved the property,

increased the security of the mortgagee, and rendered the operation of the property more economical, nor the fact that it was necessary to keep the mortgagor a going concern, nor the fact that the mortgagor pledged or mortgaged the current income to secure the payment of the claim, can raise such an equity as will entitle it to a preferential lien upon either the income or the corpus of the mortgaged estate over the lien of the prior mortgage. These propositions conclusively answer the question presented in this case.

Nor will a perusal of the authorities from the supreme court cited by counsel for the intervener, and a careful examination of the facts and opinions in those cases, disclose any decision adverse to this answer or to any of the propositions upon which it rests. As usual in cases of claims for preferential liens in equity, the case of Fosdick v. Schall, 99 U. S. 235, 251, 252, 25 L. Ed. 339, 342, has been cited, quoted, and made the foundation of the argument for the intervener. It is true that Chief Justice Waite in delivering the opinion of the supreme court in that case said:

"We have no doubt that when a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. Railroad mortgages and the rights of railroad mortgagees are comparatively new in the history of judicial proceedings. They are peculiar in their character, and affect peculiar interests. * * * The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter. as the necessities of the case require; and, when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment, and improvements are permitted to accumulate, in order that bonded interest may be paid, and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements."

But it is an interesting fact that these remarks, upon which so many arguments are based for the preference of unsecured to secured creditors in the application of the income and proceeds of mortgaged property, were obiter dicta, and that the supreme court has ever since they were delivered been industriously engaged in limiting their terms and restricting their effect, until it has finally declared in the cases of Southern R. Co. v. Carnegie Steel Co. and Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., supra, that no claim which is not a current debt incurred in the ordinary course of the operation of the property of the mortgagor can be allowed a preference in payment over the lien of the prior mortgage. The decision in Fosdick v. Schall, 99 U. S. 255, 25 L. Ed. 339, was far from the broad proposition contained in the remarks we have quoted, and was in no way supported by them. It was that a claim of a vendor of cars for their rent for six months immediately prior to the receivership, which was, under the contract of sale,

a part of the purchase price of the cars, was entitled to no equitable lien upon the proceeds of the mortgaged property superior to that of the mortgage bondholders, and the decree of the circuit court which gave such a preference was reversed.

In Huidekoper v. Locomotive Works, 99 U. S. 258, 260, 25 L. Ed. 344, the circuit court had given preference in payment over the mortgage to the claim of a creditor for a balance of the purchase price of rolling stock which had been secured upon the locomotives, and had been partially paid by a foreclosure of the lien thereon. The supreme court reversed the decision of the court below, and declared that the vendor had no equitable lien upon any fund in court as security for his debt.

Miltenberger v. Railway Co., 106 U. S. 286, 308, 311, 1 Sup. Ct. 140, 27 L. Ed. 117, is another case upon which much reliance seems to be placed by counsel for the intervener. In that case the supreme court sustained a decree which directed the receivers operating the mortgaged property to pay, in preference to the mortgage debt, the arrears due for operating expenses of the railroad for a period not exceeding 90 days prior to the appointment of a receiver, an amount not exceeding $10,000, to several connecting lines of railroad, in settlement of ticket and freight balances, and in payment for materials and repairs, a part of which accrued more than 90 days before the appointment of the receiver, and the expenses of constructing six miles of railroad and a bridge, which were built subsequent to the appointment of a receiver, pursuant to the orders of the court. Much stress is laid upon the fact that under this decree the expenses of constructing the six miles of railroad and the bridge were preferred in payment to the lien of the mortgage. But the railroad and bridge were not constructed by the mortgagor prior to the appointment of the receiver, but by the receiver under the orders of the court. Moreover, the mortgagees in that case had contented themselves with merely protesting generally and disclaiming all interest under the receivership. Without other action to prevent the construction of the railroad and bridge, and with full knowledge that the receiver was proceeding to construct them under the orders of the court, they had remained silent until the receiver had incurred the expenses of the construction and had completed the work. The court held that, under these circumstances, they were estopped from claiming that the expenses so incurred should not be paid out of the income or proceeds of the mortgaged property. It said:

"A court of equity, however it might act on the question of original authority or discretion, if presented in season and under circumstances of good faith, will not visit upon innocent parties dealing with a receiver, within the authority of its orders, consequences which result from the inequitable negligence and supineness of a party to the suit, or of those represented by him." Page 308, 106 U. S., page 159, 1 Sup. Ct., and page 125, 27 L. Ed.

The case was decided upon the principle of estoppel, and not upon the theory that a claim for the expense of construction was superior in equity to the lien of a prior mortgage.

In Trust Co. v. Souther, 107 U. S. 591, 593, 595, 2 Sup. Ct. 295,

27 L. Ed. 488, it was held that the court appointing a receiver might properly order him, before paying the mortgage debt, to pay out of the proceeds of the mortgaged property all amounts owing by the railroad company for labor or supplies that accrued in the operation and maintenance of the railroad within six months prior to the appointment of the receiver, where the receiver had, with the consent of the mortgagee, used the income which he obtained during the receivership in making permanent repairs and improvements on the property, instead of paying the claims for labor and supplies.

In Burnham v. Bowen, 111 U. S. 776, 783, 4 Sup. Ct. 675, 28 L. Ed. 596, the decision was that, in a case in which the income of the receivership had been diverted to pay for the right of way, the court might charge a claim for fuel necessarily furnished to, and used by, the railroad company in the ordinary course of the operation of its road, and within 12 months prior to the receivership, as a lien upon the mortgaged property superior to that of the mortgage, but Mr. Chief Justice Waite added:

"We do not now hold, any more than we did in Fosdick v. Schall, or Huidekoper v. Locomotive Works, 99 U. S. 258, 260, 25 L. Ed. 344, that the income of a railroad in the hands of a receiver, for the benefit of mortgage creditors who have a lien upon it under their mortgage, can be taken away from them, and used to pay the general creditors of the road. All we then decided, and all we now decide, is that, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use."

In Union Trust Co. v. Illinois M. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963, claims for amounts due employés of the road for services within six months preceding the appointment of the receiver, and for debts incurred for the ordinary expenses of the receivers in operating, repairing, and maintaining the road in passable condition, were allowed a preference in payment over the claim of the mortgagee.

In Penn v. Calhoun, 121 U. S. 251, 7 Sup. Ct. 906, 30 L. Ed. 915, a claim of a bank for money loaned to and used by the mortgagor to pay current expenses and pressing debts, just before the foreclosure, was refused a preference in payment over the mortgage debt.

In Sage v. Railroad Co., 125 U. S. 361, 375, 379, 8 Sup. Ct. 887, 31 L. Ed. 694, an unsecured creditor obtained a judgment against the company, and upon a creditors' bill secured the appointment of a receiver, who proceeded to operate the railroad, and to collect the income for the benefit of the judgment creditor. Individual bondholders, who were secured by a mortgage upon the railroad and its income, intervened, without the appearance of their trustees, in the suit brought by the unsecured judgment creditor, and the supreme court held that they did not thereby deprive him of his priority of right to the income accumulated by the receiver appointed under his bill.

In St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832, the supreme court refused to make the amount due for the rent of a track used by the

mortgagor before the appointment of a receiver a preferred claim to that of the bondholders upon the proceeds of the mortgaged property. In the opinion Mr. Justice Matthews thus enumerates the claims that may be preferred in the distribution of the income:

"It is undoubtedly true that operating expenses, debts due to connecting lines growing out of an interchange of business, and debts due for the use and occupation of leased lines, are chargeable upon gross income before that net revenue arises which constitutes the fund applicable to the payment of the interest on the mortgage bonds." Page 673, 125 U. S., page 1017, 8 Sup. Ct., and page 837, 31 L. Ed.

In Trust Co. v. Morrison, 125 U. S. 591, 612, 8 Sup. Ct. 1004, 31 L. Ed. 825, a preference in the distribution of the proceeds of the sale of mortgaged property was allowed to a surety who had executed a bond for an injunction that enabled the railroad company to prevent the sale of its rolling stock on execution and to continue the operation of the railroad. But Mr. Justice Bradley, in rendering the opinion of the court, quoted the remark of Mr. Chief Justice Waite in Burnham v. Bowen, which appears above, and declared that it was not the intention of the court to decide anything in conflict with that declaration.

In Kneeland v. Trust Co., 136 U. S. 89, 98, 10 Sup. Ct. 950, 953, 34 L. Ed. 379, 383, the supreme court held that a claim for the rent of rolling stock for three months immediately prior to the filing of the bill for foreclosure was not entitled to a preference over the mortgage debt in the distribution of the proceeds of the sale of the property, although the rolling stock was used during that time by a receiver of the railroad company appointed on a creditors' bill. In delivering the opinion of the court in that case, Mr. Justice Brewer said:

"The appointment of a receiver vests in the court no absolute control over the property, and no general authority to displace vested contract liens. Because in a few specified and limited cases this court has declared that unsecured claims were entitled to priority over mortgage debts, an idea seems to have obtained that a court appointing a receiver acquires power to give such preference to any general and unsecured claims. It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness. Indeed, we are advised that some courts have made the appointment of a receiver conditional upon the payment of all unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations? One holding a mortgage debt upon a railroad has the same right to demand and expect of the court respect for his vested and contracted priority as the holder of a mortgage on a farm or lot. So, when a court appoints a receiver of railroad property, it has no right to make that receivership conditional on the payment of other than those few unsecured claims which, by the rulings of this court, have been declared to have an equitable priority. No one is bound to sell to a railroad company, or to work for it, and whoever has dealings with a company when property is mortgaged must be assumed to have dealt with it on the face of its personal responsibility, and not in expectation of subsequently displacing the priority of the mortgage liens. It is the exception, and not the rule, that such priority of liens can be displaced."

In Railroad Co. v. Wilson, 138 U. S. 501, 508, 11 Sup. Ct. 405, 34 L. Ed. 1023, the claim of an attorney for services rendered to the railway company in recovering its engines from the receiver of an-

other corporation, and for obtaining an allowance against that receiver for $1,500, was allowed a preference over the lien of the mortgage, because his services were rendered in the ordinary course of the operation of the railroad, and inured to the benefit of the mortgagee. But another claim which he presented for services rendered for the mortgagor, which secured no benefit to the mortgagee, was denied a preference.

In Thomas v. Car Co., 149 U. S. 95, 110, 111, 112, 13 Sup. Ct. 824, 37 L. Ed. 663, a preference was denied to a debt from a railroad company to a car company for rental of cars prior to the commencement of the suit to foreclose the mortgage. Mr. Justice Shiras, in delivering the opinion of the supreme court, quoted with approval the language of Mr. Justice Brewer in Kneeland v. Trust Co., 136 U. S. 97, 10 Sup. Ct. 953, 34 L. Ed. 383, which we have copied supra, and said:

"The case of a corporation for the manufacture and sale of cars, dealing with a railroad company whose road is subject to a mortgage securing outstanding bonds, is very different from that of workmen and employés, or of those who furnish from day to day supplies necessary for the maintenance of the railroad. Such a company must be regarded as contracting upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity."

In Trust Co. v. Cooper, 162 U. S. 529, 16 Sup. Ct. 879, 40 L. Ed. 1062, a coal and railway company had made an agreement with a contractor for the construction of a building for it. After the contractor had commenced his work a receiver of the property of the company was appointed under foreclosure proceedings. The building which the contractor was erecting was not covered by the mortgage. The contractor then proceeded, under an order of the court, and with the consent of the receiver, towards the completion of the building. The court held that, as the building was an asset in the hands of the receiver, the claim of the contractor for the work done upon it was entitled to payment out of the income or out of the proceeds of the property of the railroad company. But this case is not in point here, because the building constructed was not covered by the mortgage.

In Virginia & A. Coal Co. v. Central R. & Banking Co., 170 U. S. 355, 370, 18 Sup. Ct. 657, 42 L. Ed. 1068, a claim for coal furnished and used in the operation of the lines of railroad of the mortgagor was held to be one of the current expenses in the ordinary course of the operation of a railroad, and to be entitled to preference in equity over the mortgage lien. In rendering the decision the court again called attention to the very few and exceptional cases in which preferential liens may be allowed under the decisions of that court. Mr. Justice White said:

"In concluding that the claims of the interveners were entitled to priority out of the surplus earnings which arose during the control of the road by the court, we must not be understood as in any wise detracting from the force of the intimations contained in the recent utterances of this court in the Kneeland Case, 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, and the Thomas Case, 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663, as to the necessity of a court of equity confining itself within very restricted limits in the application of the

doctrine that in certain cases a court having a road or fund under its control may be justified in awarding priority over the claims of mortgage bondholders to unsecured claims originating prior to a receivership."

All the cases cited by counsel for the intervener from the supreme court which bear upon the question in hand have now been reviewed. While there are dicta in some of the earlier opinions of that court (notably in Fosdick v. Schall) upon which a plausible argument that a claim for material or money furnished for a "permanent improvement" to the mortgaged property may be preferred to a prior mortgage, there is no decision of that court to that effect, or adverse to the principles established and affirmed by the line of cases opening with Dunham v. Railway Co., 1 Wall. 254, 267, 17 L. Ed. 584, in 1863, and closing with Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 44 L. Ed. 475, which have been examined in an earlier part of this opinion. Since those authorities decide the question before us, and as the decisions of the supreme court are conclusive here, it would be an idle task to consider the opinions of other courts. When a careful examination and analysis of the facts and opinions in all the cases in the supreme court upon the subject of preferential claims in suits to foreclose mortgages of quasi public corporations is made, and dicta are distinguished from adjudications, the decisions of that court will be found to sustain these propositions: A mortgagee of the property, acquired and to be acquired, and of the income of a quasi public corporation, such as a railroad company, obtains a lien upon the net income of the company after the current expenses of operation incurred in the ordinary course of business are paid, and impliedly agrees that the gross income shall be first applied to the payment of these current expenses, before the net income to which he is entitled arises. A court of equity engaged in administering mortgaged railroad property under a receivership in a foreclosure suit may prefer unpaid claims for current expenses of the ordinary operation of the railroad, incurred within a limited time before the receivership, to a prior mortgage lien, in the distribution of the income or of the proceeds of the mortgaged property. If such a mortgagor diverts the current income from the payment of current expenses to the payment of interest on the mortgage debt, or to the improvement of the mortgaged property, so that current expenses remain unpaid when a receiver is appointed, the court may, out of the income accruing during the receivership, restore to the unpaid claims for current expenses the amount so diverted. But if there has been no diversion there can be no restoration, and the amount of the restoration cannot exceed the amount of the diversion. The class of claims which may be awarded a preference in payment over the prior mortgage debt in equity is limited to claims for current expenses incurred in the ordinary course of the operation of the mortgaged property within a limited time before the appointment of a receiver. It does not include claims for money loaned, or for material or labor furnished to make necessary beneficial and permanent additions or improvements to the mortgaged property. The

broad language of the dicta in Fosdick v. Schall, that "necessary operating and managing expenses, proper equipment, and useful improvements" are to be deducted from the current income before the net income out of which the mortgage debt is to be paid arises, has been disapproved and modified, and the class of claims entitled to equitable preference has been limited, by the later decisions of the supreme court in Kneeland v. Trust Co., 136 U. S. 89, 98, 10 Sup. Ct. 950, 34 L. Ed. 379; Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co., 137 U. S. 171, 196, 198, 11 Sup. Ct. 71, 34 L. Ed. 625; Thompson v. Railroad Co., 132 U. S. 68, 71, 73, 10 Sup. Ct. 29, 33 L. Ed. 256; Thomas v. Car Co., 149 U. S. 95, 110, 13 Sup. Ct. 824, 37 L. Ed. 663; Southern R. Co. v. Carnegie Steel Co., 176 U. S. 257, 296, 20 Sup. Ct. 347, 44 L. Ed. 458; and Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 44 L. Ed. 475,—to claims incurred for the current expenses of the operation of the mortgaged property in the ordinary course of the business of the mortgagor. The test of the preferential equity of a claim is its consideration. If its consideration was a current expense of the operation of the mortgaged property, which inured to its benefit, and which was incurred in the ordinary course of its business, within a limited time anterior to the appointment of the receiver, the claim may be preferred. The supreme court has refused to apply the principle of the civil and maritime laws of awarding priority to the last creditor who furnished necessary repairs and supplies to a vessel to the distribution of the proceeds of the foreclosure of mortgages of quasi public corporations. Railroad Co. v. Cowdrey, 11 Wall. 459, 474, 482, 20 L. Ed. 199; Thompson v. Railroad Co., 132 U. S. 68, 74, 10 Sup. Ct. 29, 33 L. Ed. 256. If the consideration of a claim is not a part of the current expenses of the ordinary operation of the mortgaged property, but is a part of the expense of constructing a permanent addition or improvement to it, out of the ordinary course of its operation, neither the fact that it tended to conserve and improve the property and increase the security of the mortgagee, nor the fact that it was necessary to keep the mortgagor a going concern, nor the fact that the mortgagor pledged or mortgaged the current income to secure it, will give the claim a preferential equity over the lien of a prior mortgage. Dunham v. Railway Co., 1 Wall. 254, 267, 17 L. Ed. 584; Railroad Co. v. Cowdrey, 11 Wall. 464, 481, 20 L. Ed. 202; Thompson v. Railroad Co., 132 U. S. 71, 73, 74, 10 Sup. Ct. 29, 33 L. Ed. 256; Railroad Co. v. Hamilton, 134 U. S. 296, 301, 10 Sup. Ct. 546, 33 L. Ed. 905; Southern R. Co. v. Carnegie Steel Co., 176 U. S. 257, 296, 20 Sup. Ct. 347, 44 L. Ed. 458; Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 44 L. Ed. 475.

The consideration of the claim for money loaned to pay for the addition to the plant and power of the mortgagor, for which a preference is sought in this case, was not one of the current expenses of the operation of the mortgaged property in the ordinary course of business, but it was money loaned to pay an extraordinary expense of the mortgagor, incurred not for the operation of its prop-

erty, but for the construction of a new and permanent addition to and improvement of it. The claim was therefore inferior in law and in equity to the prior lien of the recorded mortgage, in the face of which it arose; and the decree below, which gave it a preference over the claims of the bondholders secured by that mortgage, must be reversed, and the case must be remanded to the court below, with directions to overrule the exceptions to the master's report and to. enter a decree in conformity therewith, and it is so ordered.

CALDWELL, Circuit Judge (dissenting). At the threshold of this case we are confronted with the question whether the doctrine of preferential debts, applicable to railroads, has any application to a corporation like the mortgagor in this case. In Wood v. Safe-Deposit Co., 128 U. S. 416, 421, 9 Sup. Ct. 132, 32 L. Ed. 473, the supreme court said:

"The doctrine of Fosdick v. Schall has never yet been applied in any case except that of a railroad. The case lays great emphasis upon the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out."

In Hanna v. Trust Co., 36 U. S. App. 61, 16 C. C. A. 586, 70 Fed. 2, and in Ford v. Trust Co., 36 U. S. App. 203, 17 C. C. A. 31, 70 Fed. 144, the question was adverted to, but not decided, by this court. The majority opinion makes no reference to this question, but by implication puts the corporation in this case on the footing of a general traffic railroad in the matter of preferential debts. I express no opinion upon that question. If the doctrine is applicable to this corporation, then the decree of the circuit court should be affirmed. The opinion of Judge Woolson (Illinois Trust & Sav. Bank v. Ottumwa Electric Ry. Co. [C. C.] 89 Fed. 235) shows what the decree was, and the grounds upon which it was rested. No extended review of the authorities on the doctrine of preferential claims is called for by this case. They have been fully reviewed by the supreme court in the late case of Southern R. Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458; and their review by the majority of the court in this case throws no new light on the subject, but, from the standpoint from which it is made, serves rather to darken it. The cases of Dunham v. Railway Co., 1 Wall. 254, 17 L. Ed. 584, and Railroad Co. v. Cowdrey, 11 Wall. 459, 20 L. Ed. 199, are cited in support of the majority opinion. As these cases were decided long before Fosdick v. Schall, the court might, with exactly as much pertinency and relevancy to the case at bar, have cited every case from the Year Books down. The question of giving certain classes of the general indebtedness of a railroad company preference over a mortgage on the road first came before the circuit courts in suits to foreclose such mortgages. Some of those courts, perceiving the difference between a railroad and all other kinds of property, and between a mortgage on a railroad and a mortgage on lands and lots (Farmers' Loan & Trust Co.

v. Kansas City, W. & N. W. R. Co. [C. C.] 53 Fed. 182; Same v. Northern Pac. R. Co. [C. C.] 71 Fed. 245), were constrained by considerations of equity and justice, which no court of equity could disregard, to give certain classes of indebtedness of the railroad company preference over the mortgage. The power was exercised very sparingly at first, but more liberally by some chancellors than others. The first case in which the supreme court took up and fully considered the question of the power of a court of equity to make preference in suits to foreclose a mortgage on a railroad was the now justly celebrated case of Fosdick v. Schall, 99 U. S. 253, 25 L. Ed. 339. The unanimous judgment of the court was delivered by Chief Justice Waite, and the opinion in that case is the foundation of the doctrine in the federal courts, and no case prior to that judgment has any application to the doctrine. No case has since gone to the supreme court, involving the question of preferential debts, in which the court has not rested its decision on the doctrine of that case, or cited it approvingly. In the very last reported case (Southern R. Co. v. Carnegie Steel Co., supra) involving the question the court quotes extensively and approvingly from the opinion in Fosdick v. Schall. In every case which has come before that court involving the question of preferential debts, it has referred approvingly to the case of Fosdick v. Schall; and in no single one of them is that case criticised, overruled, or declared obiter dicta. In view of these facts it is a matter of surprise to find it stated in the majority opinion that the greater part of the unanimous opinion of the supreme court in Fosdick v. Schall is obiter dicta and to be disregarded. It is difficult to harmonize all the judicial utterances and conclusions in the different cases that have been considered by that court. But this is not surprising when we reflect that the whole doctrine is of modern origin, and that it is not based on any written law, but upon equitable considerations, the application of which rests in a large degree upon the sound judicial discretion of the chancellor, having due regard to the circumstances of the particular case. Some contrariety of opinion and practice in the application of a principle resting solely on equitable considerations, the application of which are dependent on the exercise of that uncertain quantity called "judicial discretion," was inevitable. It was in view of these considerations that the supreme court, unlike the majority of this court in the case at bar, has uniformly refused to lay down any fixed and inflexible rule for the application of the doctrine. Every case is left to be determined on its own special equities. In Fosdick v. Schall the supreme court said:

"No fixed and inflexible rule can be laid down for the government of the courts in all cases. Each case will necessarily have its own peculiarities, which must to a greater or less extent influence the chancellor when he comes to act."

And in Southern R. Co. v. Carnegie Steel Co., supra, after reviewing the cases, the supreme court says:

"It is apparent from an examination of the above cases that the decision in each one depended upon its special facts. This court has uniformly refrained from laying down any rule as absolutely controlling in every case

involving the right of unsecured creditors of a corporation, whose property is in the hands of a receiver, to have their demands paid out of net earnings in preference to mortgage creditors."

And this is again repeated at page 292, 176 U. S., page 358, 20 Sup. Ct., and page 473, 44 L. Ed., where it is said:

"Each case, as already observed, must depend largely upon its special facts."

In Lackawanna Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 369, 44 L. Ed. 475, 484, decided on the same day with the Carnegie Steel Company Case, the court said:

"The decision in each case has been more or less controlled by its special facts."

And like utterances are found in other opinions of that court.

In the case of Farmers' Loan & Trust Co. v. American Water-works Co. (C. C.) 107 Fed. 23, in which the intervener, the Holly Manufacturing Company, was allowed $44,000 as a preferential claim for three engines and other material furnished to the Water-works Company, Judge Sanborn says:

"It is perhaps impossible, and, if possible, it would be unwise, to draw the line of demarkation between claims that may and those that may not be preferred to the mortgagees in payment out of the income earned by an insolvent corporation, after receivers in foreclosure are appointed, or out of the corpus of the property. The special circumstances of each case will necessarily and rightfully influence the discretion of the court."

In the case at bar the majority of the court find the machinery and other improvements procured and built with the money of the intervener were not necessary to keep the corporation a going concern, or to prevent a forfeiture of its charter, or to enable it to discharge any duty it owed to the public and was bound to discharge, and that, as the contract to light the city entailed a loss of $2,700 per year on the company, the addition and improvement of its plant which enabled it to continue to perform that contract was an actual damage to the company. In the face of these findings, there is no rule or decision under which the intervener's claim could be held to be preferred. And when the court arrived at these conclusions this case was decided against the intervener, and all that it said thereafter is obiter dicta and not binding on this or any other court. But, in disregard of the rule of the supreme court to confine the decision in this class of cases to the particular facts and circumstances of the case in hand, the majority opinion, after finding facts which effectually dispose of the case at bar, proceeds to a general discussion of the doctrine of preferential debts, and concludes by laying down numerous inflexible and cast-iron rules for the determination of all cases which may arise in the future. One of these rules declares:

"The class of claims which may be awarded a preference in payment over the prior mortgage debt in equity is limited to claims for current expenses incurred in the ordinary course of the operation of the mortgaged property within a limited time before the appointment of a receiver. It does not include claims for money loaned or for material or labor furnished to make necessary beneficial and permanent additions or improvements to the mortgaged property."

As applied to this case, this rule, for the reasons we stated, is obiter dicta, and, moreover, is not law. It is in direct conflict with the judgment of this court in Trust Co. v. Riley, 36 U. S. App. 100, 16 C. C. A. 610, 70 Fed. 32, in which the judge who writes the majority opinion in this case wrote the unanimous opinion of the court. After a full review of the authorities the court, speaking by Judge Sanborn, said:

"From this brief review of the decisions of the supreme court bearing upon this question, we think these propositions may properly be deduced: First. There are certain claims against a mortgaged railroad, accruing before the appointment of a receiver, which are entitled to a preference over a prior mortgage debt in payment out of the earnings of the railroad during the receivership, and out of the proceeds of the sale of its property. Second. It is an indispensable element of every such claim that it is founded upon property furnished or services rendered to the mortgagor which either preserved or enhanced the value of the security of the mortgage debt, and thereby inured to the benefit of the mortgagee. Third. Claims of this character have been given a preference over the mortgage debt by these decisions on one of two grounds,—either on the ground that the mortgage is a lien on the net, and not on the gross, income of the railway company; and where that part of the income which is applicable to the payment of current expenses of operation, proper equipment, and necessary improvements has been diverted to pay interest on the mortgage debt, or to otherwise benefit the security, and this diversion has left claims for these expenses unpaid, it is the province and duty of the chancellor to restore the diverted fund by taking an equal amount from the earnings of the railway company during the receivership, and applying it to the payment of these claims in preference to the mortgage debt. Fosdick v. Schall; Burnham v. Bowen; St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. Ry. Co.; Railroad Co. v. Hamilton; Morgan's L. & T. R. & S. S. Co. v. Texas Cent. Ry. Co.,—supra."

Again it is said:

"Repairs and improvements increase the value of the security of the bond-holders."

It will be observed that among the claims classed as preferential by the court are claims "founded upon property furnished or services rendered to the mortgagor, which either preserved or enhanced the value of the security of the mortgage debt, and thereby inured to the benefit of the mortgagee," and debts incurred for "proper equipments and necessary improvements," or any expenditure that operates "to otherwise benefit the security." The intervener's claim in this case is founded on property furnished to the mortgagor which enhanced the value of the security of the mortgage debt, and thereby inured to the benefit of the mortgagee. It is for "proper equipments and necessary improvements," and was an expenditure that operated to benefit the security, so that it falls exactly within the rule announced by this court in Trust Co. v. Riley.

Contrary to the finding of the majority of the court, I find, from a careful consideration of the facts disclosed by the record, that the improvements made were necessary to enable the company to continue as a going concern, so far as relates to furnishing lights, and to carry out its contract to light the city, and to discharge its obligations under its charter. It is immaterial whether the contract to furnish light was profitable or unprofitable to the company. It was a contract to perform public service of vital importance to the

city and its inhabitants. The doctrine that a corporation bound by contract to light the streets of a city may with impunity repudiate that contract whenever it proves to be unprofitable or its plant inadequate to the purpose is not sound. When the company entered into a contract to light the streets of the city, it took upon itself the discharge of a public duty which it was bound to perform according to the terms of its contract. Neither its insolvency, nor the fact that its plant was inadequate for the purpose, nor the fact, if it was a fact, that compliance with its contract entailed a loss, would be received by the law as an excuse for its nonperformance. It is conceded that the company was saved $4,000 a year in expenses by these improvements and additions to its plant. The improvements and additions passed to the mortgagees, under the mortgage, and were worth all or more than they cost. The company would have been liable to the city for the breach of its contract to light its streets, so that the failure of the company to comply with its contract would not relieve it of any loss under the contract, but would impose new and additional liabilities upon it. It would, moreover, have furnished a ground for the forfeiture of its charter. It is not necessary to prove that this forfeiture would have been enforced. It is enough that it might have been. The contention of the majority that, where a company's charter authorizes and requires it to operate a street railroad and an electric plant sufficient to light the streets of a city, it must be regarded as a going concern as to both, so long as it operates one of them, and that it cannot, therefore, be said that improvements and additions made to one of them, without which it must have been abandoned, were necessary to keep the company a going concern, is too obviously untenable to require discussion. In Fosdick v. Schall, supra, without assuming to enumerate all the kinds of claims which might be allowed, the court specified the following:

"Outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property, as may, under the circumstances of the particular case, appear to be reasonable."

Again:

"The income out of which the mortgagee is to be paid is the net income obtained from deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements."

In Central Trust Co. v. Wabash St. L. & P. Ry. Co. (C. C.) 30 Fed. 332, over $2,000,000 of claims were allowed for borrowed money "in order to provide means for the meeting of its expenses and the keeping of its road in successful operation, and completing its lines as aforesaid." See Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. Ry. Co. (C. C.) 53 Fed. 182. In Trust Co. v. Clark, 26 C. C. A. 397, 81 Fed. 269, preference was given to a claim for a gear wheel and pinion. In Manhattan Trust Co. v. Sioux City Cable Co. (C. C.) 76 Fed. 658, for power furnished a street railway. In Railroad Co. v. Wilson, 138 U. S. 501, 11 Sup. Ct. 405, 34 L. Ed. 1023, a preferential claim was allowed for attorney's fees. In Morrison's Case, 125 U. S. 591, 8 Sup. Ct. 1004, 31 L. Ed. 825, an allowance was made

for damages suffered by reason of an injunction bond to prevent the sale of rolling stock. In Manhattan Trust Co. Case (C. C.) 76 Fed. 658, an allowance for an electric generator. In Miltenberger Case, 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117, claim was allowed for the construction of five miles of road, repairs on bridge, purchase of engines, etc.; some of the claims existing before, and some accruing after, appointment of the receiver. In Cleveland, C. & S. Ry. Co.'s Case (C. C.) 86 Fed. 73, claim allowed for the construction of railroad bridge. In Atkins' Case, 3 Hughes, 307, Fed. Cas. No. 604, for moneys advanced by bondholders and stockholders to pay labor claims. In Farmers' Loan & Trust Co. v. American Waterworks Co., supra, claim allowed for engines, hydrants, boilers, valves, etc., furnished the American Water Company at Omaha. Farmers' Loan & Trust Co. v. Northern Pac. R. Co. (C. C.) 71 Fed. 245, claim allowed on account of going on an appeal bond, upon the same principle as Morrison's Case. In Farmers' Loan & Trust Co.'s Case (C. C.) 71 Fed. 250, claim allowed for taxes paid. Penn Mut. Life Ins. Co.'s Case, 141 Ill. 35, 31 N. E. 138, claim allowed for right of way damages. In Southern R. Co. v. Carnegie Steel Co., supra, a claim for steel rails was held to be a preferential debt. And in Farmers' Loan & Trust Co. v. Lamont, 69 Fed. 23, 16 C. C. A. 364, 32 U. S. App. 480, this court held a claim for rent of a waiting room for passengers and an office for the company's ticket agent was a preferential debt.